In the

# United States Court of Appeals
## For the Seventh Circuit

————————

No. 07-1487

MARCELLA RICHMAN, both individually and as special
    administrator of the estate of Jack B. Richman,
    deceased,

*Plaintiff-Appellee,*

*v.*

MICHAEL SHEAHAN, et al.,

*Defendants-Appellants.*

————————

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 98 C 7350—**Joan B. Gottschall**, *Judge.*

————————

ARGUED NOVEMBER 2, 2007—DECIDED JANUARY 7, 2008

————————

Before EASTERBROOK, *Chief Judge*, and POSNER and RIPPLE,
*Circuit Judges.*

POSNER, *Circuit Judge.* Eighteen deputy sheriffs of Cook
County, sued under 42 U.S.C. § 1983 for violating the
federal constitutional rights of the plaintiff, and of her
son who died resisting arrest, appeal from the denial
of their motion for summary judgment on grounds of
official immunity. The district judge ruled that they had
immunity from the Fourth Amendment claim on the

son's behalf, but not from the Eighth Amendment claim (which is solely on behalf of the son) or from the Fourth Amendment claim on the plaintiff's own behalf.

The case, before us for the second time, is very old. We ruled the first time that the defendants were not entitled to the absolute immunity from tort suits that judges enjoy, merely because they committed the alleged torts in the course of carrying out the judge's order to remove the plaintiff's son from the courtroom. 270 F.3d 430 (7th Cir. 2001). The judge did not order them to commit a tort, and, even if he had done so, to clothe them with judicial immunity would be as absurd as ruling that the judge would have been immune from liability had he brained the plaintiff's son with his gavel. But the defendants may be entitled to qualified immunity; let us see.

The event giving rise to the suit occurred in Skokie in 1997 when the plaintiff, an elderly woman who walks with a cane, and her son, Jack Richman, a grossly obese 34 year old—6 feet 2 inches and weighing 489 pounds—who also walked with a cane, were waiting in the courtroom of an Illinois state court for her case (she was fighting a traffic ticket) to be called. At 4 p.m., the end of the court day, the judge told the Richmans that he was continuing the case to the next day. Both Richmans were irate, and protested vigorously. The judge listened to them for a while and then told them to be quiet, on pain of being held in contempt of court. When Jack Richman continued protesting, the judge pushed the panic button on his bench to summon deputy sheriffs, who provide security in the court; there were none in the courtroom at the time. Two of the deputies responded. The judge told Richman to leave the court with them. He refused, and the judge declared him in contempt, ordered the deputies to

arrest Richman, and, with Richman continuing to refuse to leave peaceably, jacked up his jail sentence for contempt, in stages, until it reached 120 days.

But when the two deputies tried to remove Richman forcibly, he clung to the podium and they could not dislodge him. Additional deputies—the other defendants in this case—now entered the courtroom and tried to seize Richman. Mrs. Richman began screaming and waving her cane. Three female deputies dragged her out of the courtroom and took her cane away. She tried to reenter but was blocked by another deputy. The three female deputies thrust her into a wheelchair and wheeled her down the hall to another courtroom, where they detained her briefly.

Back in the courtroom the struggle between the deputies and Jack Richman continued for a few minutes until the deputies managed to drag him from the podium to the floor, where he lay prone, his face down, but continued to struggle with what by now was a swarm of deputies. They tried to handcuff him and eventually succeeded. By then, several of them were on Richman's back. (Meanwhile the judge had left the courtroom.) Richman screamed that he couldn't breathe. Then he fell quiet and the deputies noticed that he had urinated and defecated and that his skin had turned blue. He was dead.

The autopsy report stated that he had died as a result of coronary artery disease to which "restraint hypoxia," or, as more commonly termed, "positional asphyxia," due to his morbid obesity had contributed. Hypoxia means a shortage of oxygen in the blood, a condition that people typically experience at high altitudes, where the air is thin. But it can also be induced by compressing the lungs, which the weight of several persons on one's back can do. So

police are warned not to sit on the back of a person they are trying to restrain, especially if he is obese. National Law Enforcement Technology Center, "Positional Asphyxia— Sudden Death" (U.S. Dept. of Justice, Office of Justice Programs, June 1995); Chicago Police Department, *Training Bulletin: Positional Asphyxia* (Feb. 1995), www.chicagoreporter.com/index.php/c/Web_Extras/d/ Chicago_Police_Training_Bulletin_on_Positional_Asphyxia (visited Dec. 5, 2007); see *LeBlanc v. City of Los Angeles*, 2006 WL 4752614, *13 (C.D. Cal. 2006); *Reindl v. City of Leavenworth*, 443 F. Supp. 2d 1222, 1232-33 (D. Kan. 2006); *Ashworth v. Round Lake Beach Police Department*, 2005 WL 1785314, at *4-*6 (N.D. Ill. 2005) (and cases cited in *id*. at *6). For the obese are especially susceptible to hypoxia, and shortage of oxygen can and apparently in this case did precipitate a fatal heart attack. American Medical Association, *Complete Medical Encyclopedia* 913 (Jerrold B. Leikin & Martin S. Lipsky eds. 2003); Ronald L. O'Halloran & Janice G. Frank, "Asphyxial Death During Prone Restraint Revisited," 21 *Am. J. of Forensic Medicine & Pathology* 39, 49 (2000); Derrick Ounder, "Acute Excited States and Sudden Death: Death After Restraint Can Be Avoided," 316 *British Medical J.* 1171 (1998).

The theory behind the Eighth Amendment claim is that the deputies were punishing Richman for his contempt of court. Of that the main evidence is merely that the judge had held him in contempt before they swarmed on him. So the claim comes perilously close to the errone-ous proposition that *any* infliction of excessive force by public officers on a person after he has been convicted is "punishment" and therefore, not conforming to the regular, prescribed procedures for imposing punish-ment (and thus "unusual"), and being severe (and thus "cruel"), violates the Eighth Amendment.

It is one thing if officers escorting a newly convicted defendant gratuitously beat him en route, thus adding to the punishment to which he has been sentenced. Cf. *Valdes v. Crosby*, 450 F.3d 1231, 1237-39 (11th Cir. 2006). But suppose an escaped prisoner is caught and in subduing him the officers use excessive force. Is that punishment? Or suppose that Richman had left the court quietly in company with the deputies after the judge sentenced him to jail but en route had broken away from the deputies and they seized him. Even if they used excessive force, it would be odd to describe what they did as the imposition of "punishment." There have to be grounds for an inference "that the purpose of the governmental action [complained of] is punishment." *Bell v. Wolfish*, 441 U.S. 520, 538 (1979).

Analysis is complicated by the fact that purpose to punish is not required when the prisoner's Eighth Amendment complaint is of severe neglect, as when a prison fails to provide a prisoner with essential medical care or to protect him against the violence of other prisoners. *Wilson v. Seiter*, 501 U.S. 294, 296-302 (1991). In such cases the test is deliberate indifference to the prisoner's welfare, rather than a punitive purpose. *Id*. at 296-97; *Estelle v. Gamble,* 429 U.S. 97, 104 (1976). That may seem a looser standard than when a punitive purpose is alleged. But it is not; often it demands more proof by the plaintiff. If a criminal defendant is sentenced to be stretched on the rack, no state of mind need be proved to establish the violation of the Eighth Amendment. It is only when the classification of an act as punishment is ambiguous that state of mind must be proved, in order to disambiguate the act. Cf. *Bell v. Wolfish*, *supra*, 441 U.S. at 535. Employing excessive force to arrest or otherwise seize a convicted

defendant is in the ambiguous category; it may be punish-
ment, but it may not be; so proof of purpose, and not
merely of the practice (such as imprisonment pursuant to
a judicial sentence), is required. The plaintiff in such a
case "must establish that prison officials acted wantonly
or, stated another way 'maliciously and sadistically for
the very purpose of causing harm.'" *Harper v. Albert*, 400
F.3d 1052, 1065 (7th Cir. 2005), quoting *Wilson v. Seiter*,
*supra*, 501 U.S. at 296. Or as we put it in *Hill v. Shelander*,
992 F.2d 714, 718 (7th Cir. 1993), the "test in eighth amend-
ment excessive force cases . . . [is] whether force was
applied in a good faith effort to maintain or restore disci-
pline or maliciously and sadistically for the very purpose
of causing harm." We found in that case that the plaintiff
had "produced evidence going beyond only the amount of
force applied by [the defendant,] . . . evidence from
which a finder of fact could infer that [the defendant had]
applied force with the intent to punish." *Id*. at 717.

There is some evidence of this kind in the present
case—evidence of bad blood between Richman and the
Skokie deputy sheriffs arising from his having been a
vociferous public opponent—once in the very same
courthouse—of mosquito spraying in Skokie. He had
disrupted at least one public meeting on the issue and been
sued—by a deputy sheriff, no less—in an effort to bar him
from attending future meetings. The deputies' hostility to
Richman, combined with the brutality with which they
treated him on the fatal day, could (if just barely) allow
a jury to infer that they were trying to punish him, and
not merely trying to arrest him, when after pulling him
down from the podium they piled on top of him. Cf. *Ayers
v. Coughlin*, 780 F.2d 205, 209-10 (2d Cir. 1985); *Sharp v.
Kelsey*, 918 F. Supp. 1115 (W.D. Mich. 1996). If so, they

violated the Eighth Amendment, and because the unlaw-
fulness of such conduct under the Eighth Amendment
was clearly established when they acted, they had, as
we held in *Hill v. Shelander*, *supra*, 992 F.2d at 718, no
defense of immunity. See also *Martinez v. Stanford*, 323
F.3d 1178, 1183-84 (9th Cir. 2003); *Skrtich v. Thornton*,
280 F.3d 1295, 1301, 1303-05 (11th Cir. 2002).

The plaintiff's brief mentions the Fourth Amendment
only in passing, but does make clear that she continues
to believe, despite the district court's contrary ruling,
that she has, both on her own and on her son's behalf,
a valid claim under that amendment. We do not treat
the insouciance in her brief as a waiver or forfeiture of
the Fourth Amendment claims. Neither party seems to
think it makes a difference which amendment the suffi-
ciency of the plaintiff's claims is tested under. That is
wrong, as we are about to see, but inconsequential, be-
cause, although never mentioning the Fourth Amend-
ment, the defendants argue at great length that they did not
use excessive force in trying to effectuate the judge's order
to remove Richman from the courtroom. The plaintiff
argues the contrary with equal vigor. If she is right, the
defendants violated the Fourth Amendment.

The Eighth Amendment is about punishment, so a
punitive purpose must be shown in an excessive-force
case litigated under that amendment—hence the language
about malice and sadism that we quoted. The issue under
the Fourth Amendment "is 'whether the officers' actions
[were] objectively reasonable in light of the facts and
circumstances confronting them.'" *Smith v. Ball State
University*, 295 F.3d 763, 770 (7th Cir. 2002), quoting *Graham
v. Connor*, 490 U.S. 386, 397 (1989); see also *Saucier v.
Katz*, 533 U.S. 194, 201-02 (2001). The officers' intent in

using force is irrelevant in a Fourth Amendment case. *Graham v. Connor*, *supra*, 490 U.S. at 397; *Phelps v. Coy*, 286 F.3d 295, 299-301 (6th Cir. 2002). Only its reasonableness matters—which means whether it was excessive in the circumstances, because if it was, it was unreasonable—and reasonableness is the focus of the briefs of both sides in this case.

But can a Fourth Amendment and an Eighth Amendment claim of excessive force be raised in the same case? Often no. If you are beaten to a pulp before you are convicted, your remedy is under the Fourth Amendment; after, under the Eighth Amendment. But when as in this case it is uncertain whether the act complained of is punishment, deciding which remedy is available must wait upon the determination of the facts. If the officers were removing Jack Richman from the courtroom because he refused to leave under his own steam, the Fourth Amendment governs; if they were punishing him for his contempt of court (an inference for which there is some evidence, as we have just seen), the Eighth.

What counts as excessive force in a particular case is of course relative to circumstances, and two circumstances are critical so far as Jack Richman's Fourth Amendment claim is concerned. The first is his extreme obesity, which was obvious to the deputies, and the second is the lack of urgency to remove him from the courtroom. The first factor, though not the second, was present in *Estate of Phillips v. City of Milwaukee*, 123 F.3d 586 (7th Cir. 1997), another case of positional asphyxia, but with critical differences, including danger to the police from the person they were struggling with, a lesser use of force, and the nonobviousness of the victim's vulnerabilities.

Although very large, Richman was very frail. Like many morbidly obese people (Richman's Body Mass Index was 62.8; normal is 18 to 25 and anything over 30 is deemed obese), he could walk only with great difficulty; and a reasonably trained police officer would know that compressing the lungs of a morbidly obese person can kill the person. Compare *Price v. County of San Diego*, 990 F. Supp. 1230, 1238-39 (S.D. Cal. 1998). So the deputies had to use care in removing him from the courtroom, unless there was some compelling need for haste. But there was not. Court was over for the day. From the effort of the first two deputies to seize Richman to his death, only seven minutes elapsed. There was no reason to endanger his life in order to remove him with such haste. A reasonable jury could find that the deputies used excessive force. This conclusion, since the legal standard governing excessive-force claims is well established, e.g., *Sallenger v. Oakes*, 473 F.3d 731, 741-42 (7th Cir. 2007); *Clash v. Beatty*, 77 F.3d 1045, 1047-48 (7th Cir. 1996); *Cruz v. City of Laramie*, 239 F.3d 1183, 1187-90 (10th Cir. 2001), and clearly applicable to a situation in which officers suffocate an obviously vulnerable person, scotches the immunity defense.

The defendants make two further arguments. The first is that the cause of Richman's death was not the force used against him but his preexisting vulnerability due to his obesity and his coronary artery disease. Had he not been so obese and therefore so especially vulnerable to hypoxia, and had he not had coronary artery disease, he would not have died or, in all likelihood, even sustained serious injury as a result of the swarm, for the force was not *that* excessive; the autopsy did not reveal any traumatic injuries, such as contusions or broken ribs.

In addition, had he not been obese but instead had had some hidden vulnerability, such as advanced heart disease with no external signs, this would undermine the plaintiff's case that the defendants had used excessive force. What is excessive is, as we said, relative to circumstances, but more precisely to circumstances as a reasonable police officer would perceive them. E.g., *Graham v. Connor, supra*, 490 U.S. at 396; *McKinney v. Duplain*, 463 F.3d 679, 684 (7th Cir. 2006); *Dean v. City of Worcester*, 924 F.2d 364, 367-68 (1st Cir. 1991). But we are over *that* hurdle, because Jack Richman's vulnerability was patent; and once over it, the nature and extent of the injury are irrelevant both to liability and to damages.

The tortfeasor takes his victim as he finds him. That is the "eggshell skull" rule, see, e.g., *Brackett v. Peters*, 11 F.3d 78, 81 (7th Cir. 1993); *Gibson v. County of Washoe*, 290 F.3d 1175, 1192-93 (9th Cir. 2002), which like most principles of the common law of torts is applicable to a constitutional tort case brought under 42 U.S.C. § 1983. *Gibson v. County of Washoe, supra*, 290 F.3d at 1193; *Figueroa-Torres v. Toledo-Davila*, 232 F.3d 270, 275-76 (1st Cir. 2000); see *City of Monterey v. Del Monte Dunes at Monterey, Ltd.*, 526 U.S. 687, 709-10 (1999). So if you kick someone and unbeknownst to you he has a serious infection at the spot in which you kick him and as a result he dies of septicemia, you are fully liable for his death even though you could not have foreseen such a consequence from the kick. Because of his infirmities, Richman did not have a normal life expectancy. But the force used against him by the swarm of deputies accelerated his death; how soon he would have died from causes unrelated to the use of that force is relevant only to damages. E.g., *Stoleson v. United States*, 708 F.2d 1217, 1223-24 (7th Cir. 1983); *Sauer v.*

*Burlington Northern R.R.*, 106 F.3d 1490, 1495 (10th Cir. 1996).

The defendants also argue that the plaintiff has failed to correlate specific harm to Jack Richman with specific acts of particular defendants. The first two deputies grabbed ineffectually at Richman; they did not compress his lungs. Some of the deputies never touched him but merely watched the mêlée from the sidelines. The plaintiff, the defendants argue, has not tried to establish a causal relation between any of them and Richman's death.

There are four possibilities in a tort case with multiple defendants, such as this. The first is that each defendant's act makes the injury to the plaintiff a little worse and it is the combination of the acts of separate defendants that does him in. Then each defendant is liable only for the increment in harm that he caused. *United States v. Burlington Northern & Santa Fe Ry.*, 502 F.3d 781, 796-97 (9th Cir. 2007); *Becker v. Poling Transportation Corp.*, 356 F.3d 381, 390-91 (2d Cir. 2004); *United States v. Alcan Aluminum Corp.*, 315 F.3d 179, 186-88 (2d Cir. 2003). An example would be several polluters of the same stream, and if one of them had not discharged pollutants the aggregate pollution would have been less severe. This may have been the situation with regard to the deputies, more than one, who sat on Richman, compressing his lungs and thus inducing hypoxia.

Second, each defendant might by his own act have inflicted the entire injury, in the sense that, had he not committed the act, the injury would have been no less grave than it was, as when two persons shoot a third and each wound would have been fatal by itself. Again, both would be liable, but this time jointly and severally. *Navigazione Libera Triestina Societa Anonima v. Newtown*

*Creek Towing Co.*, 98 F.2d 694, 696-97 (2d Cir. 1938) (L. Hand, J.); *Kingston v. Chicago & N.W. Ry.*, 211 N.W. 913, 914-15 (Wis. 1927). This, for all we may ever know, may be a more accurate description of the consequences of Richman's being sat on by several deputies at once, given his extreme vulnerability.

Third, as in *Summers v. Tice*, 199 P.2d 1 (Cal. 1948), each defendant might have committed an act that is a tort when injury results (for there is no tort without an injury), but it is unclear which defendant's act was the one that inflicted the injury—both shot at the plaintiff, one missed, but we do not know which one missed. Again both are jointly and severally liable. This too may have been the case here with regard to the defendants or a subset of them.

And fourth, one defendant might commit the act that causes the harm yet the other be sued as well because he could have prevented the harm but did not. Tort law imposes no general duty of rescue, *Stockberger v. United States*, 332 F.3d 479, 480-82 (7th Cir. 2003), and—the same principle, really, but in the idiom of constitutional law—the failure of a public officer to rescue a person threatened with harm by a third party is not deemed a deprivation of life or liberty without due process of law. *DeShaney v. Winnebago County Department of Social Services*, 489 U.S. 189, 195-97 (1989). But there is an exception for the case in which the officer is responsible for creating the peril that creates an occasion for rescue, as when, having arrested a drunken driver, the officer removes the key from the ignition of his car, as a result stranding the passengers late at night in an unsafe neighborhood, and he does nothing to protect them and they are robbed by local marauders and sue him for battery or for having deprived them of (a form of) liberty without due process

of law. *Wood v. Ostrander*, 879 F.2d 583, 586-87 (9th Cir. 1989); see *Monfils v. Taylor*, 165 F.3d 511, 517 (7th Cir. 1998).

Suppose now that there are two arresting officers, and both drive off together, abandoning the passengers to their fate, though only one had removed the key from the ignition of the arrested driver's car. The other officer, provided he knew or should have known what the first officer had done, would be liable along with the first officer as a participant in the conduct giving rise to the peril. *Miller v. Smith,* 220 F.3d 491, 495 (7th Cir. 2000); *Thompson v. Boggs*, 33 F.3d 847, 856 (7th Cir. 1994); *Byrd v. Brishke,* 466 F.2d 6, 10-11 (7th Cir. 1972); *Gaudreault v. Salem,* 923 F.2d 203, 207 n. 3 (1st Cir. 1990). It is the same here with regard to those deputies who just stood around looking while Richman was being swarmed. If they should have realized that their colleagues were using excessive force they had a duty to intervene, for they were part of the arresting force, awaiting a call to join the swarm should it become necessary.

But though the non-sitters can thus be culpable for failing to pull the sitters off the pile, this does not exhaust the possibilities. We do not know that all the defendants were even in the courtroom long enough to take effective action to protect Richman; nor that none of the non-sitting defendants tried to help him. These, however, are questions to be explored on remand; the district judge was wrong to think that the defendants had immunity with respect to the Fourth Amendment claim on behalf of Jack Richman.

That leaves for consideration Mrs. Richman's Fourth Amendment claim to have been subjected to excessive force when she was seized. The judge denied summary judgment for the defendants on that claim, but this was error.

We repeat that what is excessive in the way of force used to seize a person is relative to circumstances, which in this case include the situation facing the deputies and the amount of force they used in trying to resolve it. It was essential to get her out of the courtroom, less because she was likely to cane a deputy than because her screaming was likely both to distract the deputies who were trying to arrest her son and to incite him to further struggles against his would-be captors. When they pushed her out of the courtroom she tried to force her way back in and at that point they had no alternative to removing her forcibly to a place out of earshot of the courtroom. Moving her by wheelchair to another courtroom was a modest use of force well suited to the situation (analogous to the gentle force permitted to be used to expel a nonviolent but resisting trespasser), and it inflicted not the slightest injury. She claims emotional injury but that must have been due to what the deputies were doing to her son rather than to her short trip in a wheelchair.

This lawsuit, a simple tort case, is in its tenth year. It is high time the district judge, who has presided over it from the beginning, grabbed it by the neck, gave it a good shake, and placed it on the path to a speedy decision.

AFFIRMED IN PART AND
REVERSED IN PART.

No. 07-1487                                                      15

A true Copy:

      Teste:

_____

*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*