In the

# United States Court of Appeals

### For the Seventh Circuit

—————————

No. 12-3401

LARRY NELSON,

*Plaintiff-Appellant,*

*v.*

CITY OF CHICAGO, RONALD LIS,
ELIZABETH WILSON, RICHARD
NOVOTNY, and BRADLEY RUZAK,

*Defendants-Appellees.*

—————————

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 09 C 883 — **Rebecca R. Pallmeyer**, *Judge.*

—————————

ARGUED DECEMBER 4, 2014 — DECIDED JANUARY 20, 2016

—————————

Before BAUER, RIPPLE, and SYKES, *Circuit Judges.*

SYKES, *Circuit Judge.* Larry Nelson was driving home one night when four Chicago police officers in two squad cars pulled him over, pointed a gun in his face, threatened to kill him, handcuffed him, and searched his car for no apparent reason. The officers have no recollection of the stop but insist that it couldn't have happened the way Nelson said it did.

Their squad-car computers, however, confirm that they ran Nelson's name through the law-enforcement database at the time of the stop and turned up nothing that would justify stopping him and searching his car.

Nelson sued the officers and the City of Chicago under 42 U.S.C. § 1983 alleging that the seizure and search violated his rights under the Fourth Amendment. A jury found for the defendants. On Nelson's posttrial motion, the district judge ordered a new trial based on an instructional error but later reversed course and reinstated the verdict.

Nelson's appeal raises no fewer than seven claims of error. Three have merit. First, and most significantly, the district judge should not have admitted evidence of Nelson's arrest record. A second error occurred when the defense attorney was allowed to cross-examine Nelson about other civil suits he had filed against the City. Third, the judge improperly allowed one of the officers to offer generalized testimony about when the police might be justified in using firearms and handcuffs during a traffic stop. These errors were not harmless. Nelson is entitled to a new trial.

## I. Background

Larry Nelson spent the evening of February 11, 2008, meeting with supporters of his unsuccessful campaign for Democratic committeeman in Chicago's 24th Ward. The election was just six days earlier, and he still had dozens of campaign signs and brochures in the back of his white Ford Windstar minivan. By 9:30 p.m. Nelson had left the gathering and was on his way home. He stopped for gas near the intersection of North Pulaski Road and West Iowa Street, an

area that was under heightened surveillance by Chicago police because of its high crime rate.

Two police cruisers followed Nelson into the gas station. After paying for his gas, Nelson began to drive away. The police followed him, activated their lights, and pulled him over.

What happened next is disputed—sort of. The four officers involved—Bradley Ruzak and Elizabeth Wilson in one squad car, Richard Novotny and Ronald Lis in the other—do not remember anything about the stop. They had made thousands of traffic stops (Officers Ruzak and Wilson stopped more than 40 drivers that night alone), and apparently nothing about their interaction with Nelson left an impression. But we do know that the officers used the laptop computers in their squad cars to run Nelson's name through the Illinois Secretary of State's database listing vehicle registrations and the Law Enforcement Agencies Data System ("LEADS"), which lists arrest warrants. One of the squad-car computers conducted a database search of Nelson's name at 9:44 p.m., the other at 9:50 p.m. These queries revealed that Nelson's car was properly registered and there were no warrants for his arrest.

While the officers remember nothing about the traffic stop, Nelson says he will never forget it. At trial he testified that Officer Ruzak approached his minivan with his gun drawn and aimed at his head. Nelson told the jury that he could see a red laser sight pointed at his face. Nelson turned off the engine of his van, threw the keys on the dashboard, and put his hands up. Officer Novotny then ordered him out of the van, but Officer Ruzak said, "Don't move or I'll blast your ass!" three times. Faced with conflicting orders, Nelson

stayed put. Officer Novotny then opened the car door and dragged Nelson out, saying, "Next time somebody tell[s] you to move, you know, you move." Nelson was placed in handcuffs. When he asked why, the officers told him to "shut up."

Nelson testified that the officers then searched him and took his driver's license from his pocket. They passed the license between them and appeared to enter his name into the laptops in their squad cars. He testified that all four officers then searched the minivan and appeared confused when they found campaign materials. Officer Wilson asked, "Who [is] Larry Nelson?" and her tone changed "360 degree[s]" when Nelson replied that it was his name on the signs. About 25 or 30 minutes after initiating the traffic stop, the officers told Nelson he was free to go. The laptop in one of the squads recorded a search of someone else's name at 9:56 p.m. Nelson was not given a traffic ticket, nor was he cited for any other violation of the law. None of the officers filed a "contact card" to document the stop, as required by departmental policy.

When Nelson got home, he called a district commander whom he knew from his community-outreach work and asked for advice. The commander suggested that Nelson call the Independent Police Review Authority ("IPRA") and ask it to retain copies of any street camera footage from the area where the stop occurred. Nelson made this request in a timely manner. Two days later he was interviewed by an IPRA investigator. The investigator's report—which Nelson signed but claims not to have reviewed—stated that the stop began at 10:05 p.m. rather than shortly after 9:30 p.m. As a

result of this discrepancy, the wrong video recording was preserved and the relevant film was destroyed.

Before trial the defendants entered into formal judicial admissions that they had "no present recollection of probable cause or reasonable suspicion sufficient for the arrest or stop of Larry Nelson on February 11, 2008," and that "[n]o information obtained by Chicago police officers as a result of the inquiries on Larry Nelson's name on computer databases on February 11, 2008 gave the officers any probable cause to arrest him." Despite these admissions, they took the witness stand and challenged Nelson's description of the stop. For example, Officer Ruzak testified that he never once used a red laser sight on his firearm or said "I'll blast your ass." Officer Novotny said he never pulled anyone out of a vehicle and never said anything like "[n]ext time you're given an order, follow the order."

Numerous evidentiary skirmishes occurred at trial. Several are relevant to Nelson's appeal; we'll elaborate as needed later in this opinion. For now, it's enough to say that the general defense strategy was to convince the jury that Nelson was lying about what happened during the traffic stop. As the defense attorney summed it up before the jury: "This lawsuit is a fraud, it's a sham, and [Nelson's] trying to con you."

The jury apparently agreed, returning a verdict for the defendants. Nelson moved for a new trial under Rule 59, raising multiple claims of evidentiary and instructional error. The judge initially granted the motion, finding that one of the jury instructions was confusing. The defendants asked the judge to reconsider that ruling; they maintained that Nelson had waived the relevant objection. Reversing

course, the judge agreed, reinstated the jury's verdict, and entered final judgment for the defendants.

## II. Discussion

On appeal Nelson reprises the arguments he made in his Rule 59 motion. We need address only three; all relate to evidentiary rulings made before and during trial. Most significantly, Nelson argues that the judge improperly admitted evidence about his prior arrests and other lawsuits he filed against the City. He also contends that the judge should not have allowed Officer Novotny to testify about the general circumstances in which police officers might justifiably use their guns and handcuffs during a traffic stop.[1]

Evidentiary rulings are reviewed for abuse of discretion. *Cerabio LLC v. Wright Med. Tech., Inc.*, 410 F.3d 981, 994 (7th Cir. 2005). "[E]ven in the face of error, we will not reverse a judgment entered on a jury verdict unless the erroneous ruling violated the objecting party's substantial rights." *Maurer v. Speedway, LLC*, 774 F.3d 1132, 1135 (7th Cir. 2014) (citation and internal quotation marks omitted). "To meet that threshold, a significant chance must exist that the ruling affected the outcome of trial." *Id*. Whether or not an error is harmless is determined in light of the trial record as a whole.

---

[1] Nelson raises the following additional claims of error: (1) the officers were erroneously permitted to testify in contradiction of their judicial admissions, and the district court's attempted cure was inadequate; (2) the burden of proof was misallocated; (3) the jury instructions were confusing; and (4) the jury's verdict was against the manifest weight of the evidence. Because we're remanding for a new trial based on other errors, we do not need to address these claims.

*Barber v. City of Chicago*, 725 F.3d 702, 715 (7th Cir. 2013).

**A. Evidence of Nelson's Prior Arrests**

Between 1983 and 1999, Nelson was arrested nine times—once for an alleged felony and eight times for alleged misdemeanors. These arrests are ancient history (the stop at issue here occurred in 2008), and all the charges were dismissed. A bit more recently, in November 2005, Nelson was arrested and charged with the unauthorized use of a weapon. *See* Complaint, *Nelson v. Balesteri*, No. 06CV6316 (N.D. Ill. Nov. 20, 2006), ECF No. 1. Unlike the other charges, this case went to trial and Nelson was acquitted. He thereafter sued the arresting officers. The City settled this case for $34,000, though without admitting any wrongdoing. *See* Release and Settlement Agreement, *Nelson v. Balesteri*, No. 06CV6316 (N.D. Ill. May 29, 2007), ECF No. 23.

Nelson moved in limine to bar evidence of his previous arrests at trial. The judge ruled that the prior-arrest evidence could come in only for impeachment purposes on the issue of Nelson's "fear of the police." The judge later clarified the scope of her ruling:

> If Mr. Nelson were to testify, for example, "I had never had any encounter with police before. I was terrified. I had never seen a uniform or a badge before. … ," then obviously he could be impeached, if it's possible to impeach him, with evidence that, in fact, he has been arrested before.

On direct examination Nelson testified at length about his public-service background, including the fact that he had occasionally worked with the police on community-outreach

projects. This line of questioning tried the judge's patience and drew repeated objections on relevance grounds from the defense. Nelson's counsel responded that the testimony was offered to rebut the defense attorney's insinuations that Nelson was greedy, financially desperate, or had a grudge against the police.

Nelson also testified about his emotional distress during the traffic stop. Asked how he felt when Officer Ruzak pointed his gun at him, Nelson said, "I was terrified, humiliated, ready to piss on myself, everything. I mean, I was just—I mean, I feared for my life." He continued on in this same vein, saying that he felt "[e]mbarrassed, terrified. I feared for my life. Don't know what this man was gonna do. I didn't know if he gonna shoot me or whatever. He still had his gun out." In response to a question about how he felt even now about his treatment during the traffic stop, he said, "I feel embarrassed, terrified. Right now, I'm still mad just looking at them right now as I speak." When asked why he was still angry despite the passage of time, Nelson answered, "Because that man had—I looked death in the face that night in that man['s] hand."

At the conclusion of Nelson's direct examination, the defense attorney requested a sidebar and argued that Nelson had opened the door for admission of evidence about his prior experience with the police—namely, his history of arrests. The judge agreed: "If there were other episodes, counsel [is] entitled to explore the possibility that there are other reasons he might be terrified by police that have nothing to do with the alleged incident."

The defense attorney then cross-examined Nelson about his prior arrests, asking: "And, sir, isn't it true that you've

actually been arrested in numerous cases?" Nelson answered, "I've been arrested before and never been found guilty of no crime." On redirect Nelson's attorney made an effort to rehabilitate, eliciting testimony that his arrests were "a long time ago," none resulted in a conviction, and none involved an officer aiming a gun at his face. No limiting instruction was given to the jury, but the judge did prohibit counsel from making any reference to the arrests in closing argument.

The judge later elaborated on her rationale for allowing this cross-examination. In her ruling on Nelson's posttrial motion, the judge said the arrest evidence was relevant to Nelson's character for truthfulness and whether he was a law-abiding citizen. But the judge hedged a bit, saying that she "may resolve this issue differently at the second trial in this case," which she had ordered based on an unrelated error. The opportunity to revisit the matter never came, of course; the judge rescinded her new-trial order and reinstated the jury's verdict.

Nelson claims that admitting this evidence was reversible error. We agree. It's well established that "[i]n general, a witness's arrest record will not be admissible." *Thompson v. City of Chicago*, 722 F.3d 963, 977 (7th Cir. 2013).

> This rule is based upon a clear recognition of the fact that the probative value of such evidence is so overwhelmingly outweighed by its inevitable tendency to inflame and prejudice the jury against the [party-witness] that total and complete exclusion is required in order that the right to trial by a fair and impartial jury may not be impaired.

*Barber*, 725 F.3d at 709 (alteration in original) (quotation marks omitted). Notwithstanding this general rule, the judge allowed the defense attorney to elicit testimony that Nelson had "numerous" prior arrests, apparently for two purposes: (1) to impeach the implication that he was an upstanding public servant with a good relationship with the police (the reason the judge cited in her Rule 59 ruling); and (2) to limit Nelson's damages, on the theory that some of his fear of the police may have been attributable to his earlier arrests (the reason she gave at trial).

We start with the impeachment rationale. "Impeachment can be effected in a number of ways, including contradiction, which involves presenting evidence that the substance of a witness's testimony is not to be believed." *United States v. Boswell*, 772 F.3d 469, 476 (7th Cir. 2014). But Nelson never made any factual statements that could be contradicted by evidence of his prior arrests. To use the example initially posited by the judge, he did not testify that he "never had any encounter with the police before." Nor did he make any remotely similar claim on the witness stand.

In her posttrial ruling, the judge added that the evidence of Nelson's prior arrests was admissible to impeach his "character for truthful and law-abiding citizenship." We don't see how. First, a witness's character for truthfulness may be impeached only by specific instances of prior conduct and only "if they are probative of the character for truthfulness or untruthfulness." FED. R. EVID. 608(b). Unlike a criminal conviction, an *arrest* is not, in itself, probative of the arrested person's character for truthfulness. *See Michelson v. United States*, 335 U.S. 469, 482 (1948) ("Arrest without more does not, in law any more than in reason, impeach the

integrity or impair the credibility of a witness. It happens to the innocent as well as the guilty."); *cf.* FED. R. EVID. 609 (permitting impeachment by evidence that the witness has been *convicted* of a crime). If the specific conduct underlying the arrest is probative of the witness's character for truthfulness, the conduct itself may be inquired into on cross-examination, subject to Rule 403 balancing for undue prejudice or some other ground for excluding the evidence. But the defense attorney did not seek permission to cross-examine Nelson about any specific conduct, nor are we given any reason to believe that any of his arrests were based on allegations of dishonest or untruthful conduct.

The judge's "law-abiding citizenship" rationale for admitting this evidence is likewise flawed. Simply put, evidence of a prior arrest does not support a conclusion that the arrested person has in fact broken the law.

So it's no surprise that the defendants have all but abandoned the impeachment rationale on appeal and argue instead that the arrest evidence was relevant to the issue of damages. Their theory is that Nelson's history of arrests either *mitigated* his fear during the traffic stop (because being arrested was old hat for him) or *augmented* it (because his numerous encounters with the police suggest that some of his emotional injury might have been preexisting).[2]

---

[2] It is unclear whether the damages "mitigation" theory offered by the defendants is viable given the rule that "[t]he tortfeasor takes his victim as he finds him. That is the 'eggshell skull' rule, which like most principles of the common law of torts is applicable to a constitutional tort case brought under 42 U.S.C. § 1983." *Richman v. Sheahan*, 512 F.3d 876, 884 (7th Cir. 2008) (internal citations omitted).

We've cast doubt on this type of argument before. In *Barber*, another false-arrest case, the defense introduced evidence of the plaintiff's *subsequent* arrest for the sole purpose of distinguishing between the damages attributable to the alleged false arrest at issue in the litigation and those that might be attributable to the later arrest. 725 F.3d at 708. We warned against admitting a civil-rights plaintiff's arrest history on this theory of relevance:

> [It] would seemingly permit any civil-rights plaintiff's criminal history to come in on the issue of emotional-distress damages, no matter how tenuous a connection the evidence has to the issue of damages or how central a role emotional distress plays during the plaintiff's case. This, of course, would be contrary to our prior statements instructing courts to proceed carefully when deciding to admit evidence of a § 1983 plaintiff's criminal past.

*Id*. at 715. In *Barber* we held that the relevance of the plaintiff's subsequent arrest was "tenuous at best," *id*. at 712, because his claim for emotional-distress damages was closely tied to the arrest at issue in the litigation rather than "any fear of police generally," *id*. at 713.

This reasoning applies here in full.[3] Nelson's arrest history had "miniscule probative value" on the question of his

---

[3] The defendants try to distinguish *Barber* by arguing that the evidence of the plaintiff's *subsequent* arrest in that case was necessarily less probative of his emotional distress at the time of his false arrest than the evidence of Nelson's *prior* arrests would be here. But in either scenario, the real question is whether the probative value of the plaintiff's arrests is

damages, *id*. at 714; the arrests were distant in time, and Nelson carefully limited his claimed emotional injury to the fear he felt during the 30 minutes of the traffic stop itself. Although he said he remained angry about the incident despite the passage of time, he never claimed that the experience left him fearful of the police more generally.

On the other side of the ledger, the risk of prejudice from this testimony was enormous. It's doubtful that the jury drew the distinction between an arrest and a legal finding of wrongdoing; where there's smoke, there's fire. Even assuming the jury accounted for this distinction, evidence of prior arrests—here numerous prior arrests—generally impugns character. And in a false-arrest case, the prejudice is even greater because it invites the jury to draw a propensity inference, forbidden by Rule 404(b), that the plaintiff is a serial law breaker and general troublemaker and the police must have had probable cause to arrest him.[4] *See Barber*, 725 F.3d at 714 (noting that that other-arrest evidence in a false-arrest suit "presents a substantial risk that the jury will render a defense verdict based not on the evidence but on emotions or other improper motives, such as a belief that bad people should not be permitted to recover from honorable police officers"). Even considering the special deference

---

substantial enough to outweigh the risk of undue prejudice inherent in this type of evidence.

[4] Under Rule 404(b), evidence of "a crime, wrong, or other act" may be admissible if it is introduced for a purpose other than a propensity inference, such as "motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." FED. R. EVID. 404(b). The defendants do not contend that Nelson's prior arrests were otherwise admissible for any of the purposes listed in Rule 404(b).

we give to the trial judge's evidentiary rulings, the evidence of Nelson's prior arrests should not have been admitted in light of the narrow scope of his claimed damages and the inherent risk of unfair prejudice.

What remains is to decide whether this error was harmless. *Barber* is instructive on this point as well. There we noted that the damage caused by admitting evidence of this sort in a false-arrest case is two-fold: First, it encourages the jury to draw an improper propensity inference that the plaintiff's other arrest made it more likely that he was committing *some* crime on the day of the arrest in question; and, second, it "provide[s] powerful ammunition to support a jury argument that [the plaintiff] is a despicable human being who should not be permitted to recover from the angelic police officers being wrongly sued." *Id.* at 717. Because the trial "boiled down essentially to a credibility contest between [the plaintiff] and the two officers," we held in *Barber* that the error was not harmless, and a new trial was required. *Id.* at 715.

The risk of an improper propensity inference was even greater here. The jury heard that Nelson had been arrested numerous times, making him appear particularly unsympathetic. The trial turned entirely on his credibility, so the harm caused by improperly admitting this damaging evidence would naturally be substantial. In *Barber* the jury was instructed to limit its use of the other-arrest evidence to the question of damages; we held that the instruction did *not* cure the error. *Id.* at 716–17. Here there was no limiting instruction.

The defendants offer a couple of counterarguments but we find them unavailing. They argue that the evidence of

Nelson's other arrests could not have been too prejudicial because it was elicited in a single cross-examination question. But that single question was especially damning, referring to "numerous" prior arrests. The defendants also direct us to *Sanchez v. City of Chicago*, 700 F.3d 919, 931–32 (7th Cir. 2012), in which we found the admission of prior-arrest evidence to be harmless error. But that case is distinguishable along several dimensions, not least because the judge gave an appropriate limiting instruction.[5] The erroneous admission of Nelson's prior arrests was not harmless.

### B. Nelson's Other Lawsuits

This wasn't Nelson's first time as a civil plaintiff. He had previously filed two lawsuits arising out of minor traffic accidents, including one against the Chicago Police Department after he was accidentally hit by a police car. That case settled for $6,000. Nelson also sued the City twice under § 1983 for alleged civil-rights violations. In one action, *Nelson v. Balesteri*, No. 06CV6316 (N.D. Ill. 2007), he claimed that police illegally searched his unoccupied parked car and home and later falsely arrested him. As we've noted, the City settled that case for $34,000; the State's Attorney's Office also instituted a grand-jury investigation against the officers involved. *See id*. at ECF No. 23. The other civil-rights suit,

---

[5] The defendants argue that Nelson waived his objection because the judge said she would consider a limiting instruction on this issue if Nelson presented one, but Nelson's attorney moved for a mistrial instead. The judge denied the mistrial motion but prohibited the parties from referring to the prior arrests in closing argument, calling the entire subject "a red herring." We're satisfied that Nelson's motion in limine and his continuous objection to this evidence during trial adequately preserved this issue.

*Nelson v. Salgado*, No. 09CV5357 (N.D. Ill. 2012), involved an alleged use of excessive force by police during an investigative detention, which aggravated Nelson's pre-existing shoulder injury. That litigation was pending when this case went to trial. In 2012 a jury found for Nelson and awarded compensatory damages of $30,000 and $5,000 in punitive damages. *Id*. at ECF No. 109.

Nelson's motion in limine sought to exclude any reference to his other lawsuits. The judge granted the motion in part, barring evidence of the other suits unless Nelson opened the door to their use as impeachment evidence. After Nelson concluded his direct testimony, the defense attorney sought permission to cross-examine him about the prior lawsuits, arguing that Nelson had opened the door by "making it seem this [arrest] was so traumatizing for him." The judge agreed: "If the fact is he also had other episodes that generated complaints, the jury is entitled to consider that, because if he's fearful from other episodes, those are episodes that are not related to these defendants."

The defense attorney's first question on cross-examination was, "Mr. Nelson, isn't it true that this is not your first lawsuit against Chicago Police?" Nelson answered in the affirmative, and counsel continued on this subject for several more questions: "And in all these cases, you allege the police did things that were wrong to you?" and "[Y]ou also have a case currently pending in another courtroom against Chicago Police?" On recross the defense attorney returned to this subject, asking Nelson if the same lawyer was representing him in his other cases.

Based on this line of questioning, Nelson's attorney moved for a mistrial. The judge denied the motion but issued the following admonition to the jury:

> You have heard evidence that … Larry Nelson has filed lawsuits against the City of Chicago. A person is entitled to file a lawsuit. There is no evidence that any of his other claims were not valid. You may consider this evidence only in deciding whether Larry Nelson's testimony concerning his damages is truthful in whole, in part, or not at all.

Despite this limiting instruction, Nelson's litigiousness was a major theme of the defense. To give a flavor, we note a few assertions from the defense attorney's closing argument:

- It's his burden. He knows that. He's done this before.
- He's working with the lawyer that sues the police.
- Why would he go through this litigation? … Because he's been paid before. That's why. And he's wanting it again.
- [Nelson claims] garden variety mental injuries with no evidence to support it. And it's the same kind of injuries he's suing the [C]ity for in other cases.

In her ruling on Nelson's posttrial motion, the judge explained that the evidence of the other lawsuits was admissible because it "went to whether or not these Defendants and this incident were the source of Plaintiff's injuries" and also countered the idea that he enjoyed a "cordial relationship" with the police. These are essentially the same impeachment

and damages rationales offered to admit evidence of Nelson's arrest history, so our analysis proceeds similarly.

As a general matter, "a plaintiff's litigiousness may have some slight probative value, but that value is outweighed by the substantial danger of jury bias against the chronic litigant." *Mathis v. Phillips Chevrolet, Inc.*, 269 F.3d 771, 776 (7th Cir. 2001) (quotation marks omitted). There are rare exceptions when the evidence is admitted for reasons other than to show the plaintiff's litigious character and it is sufficiently probative to survive Rule 403 balancing. For example, in *Gastineau v. Fleet Mortgage Corp.*, 137 F.3d 490, 495 (7th Cir. 1998), a workplace sexual-harassment suit, we affirmed the district court's decision to admit testimony that the plaintiff had sued three of his former employers because the evidence was probative of his "*modus operandi* of creating fraudulent documents in anticipation of litigation." We also noted that the evidence helped explain why the employer in that case had kept a detailed record of the plaintiff's actions. *Id.* Finally, the evidence provided insight into the plaintiff's mental state and alleged damages because he had not mentioned the earlier suits to his expert psychologist. *Id.*

Here, however, neither of the reasons for admitting this evidence holds up. We fail to see how evidence of Nelson's other suits qualifies as impeachment. Nothing in his direct testimony could be contradicted by evidence that he had filed other suits against the City. The judge apparently thought that Nelson's testimony about his public-service experience left a general impression that he had a "cordial relationship" with local police. But Nelson never claimed to have wholly placid relations with the Chicago Police Department. Rather, he testified: "I complain when I see some-

thing wrong, I fully do. … If I see the officer doing wrong, I complain about it. If they['re] doing right, I praise them for doing the[ir] jobs."

The damages rationale fares no better. Without knowing more about the facts underlying the prior suits, there's no way for the jury to meaningfully evaluate this evidence vis-à-vis Nelson's claimed damages in this case. The City had no interest in putting the facts of the prior lawsuits before the jury, so it's not surprising that it did not do so. As such, the only possible purpose for admitting this evidence was to brand Nelson as a litigious person who (at best) had thin skin or (at worst) had a vendetta against the Chicago Police Department and was gaming the system to make an easy buck. Those inferences are especially prejudicial in a false-arrest suit with no third-party witnesses because the plaintiff is always vulnerable to the accusation that he made everything up. The gratuitous question about Nelson's lawyer—apparently meant to suggest the attorney and her client were in cahoots in a scheme to defraud the City—compounded the prejudice.

The defendants insist that Nelson's testimony about his favorable settlements with the City would lead the jury to conclude that his earlier claims were meritorious. Maybe so; but we think there's a significant chance that the jury also concluded that the City had paid Nelson enough already. That was certainly the thrust of the defense attorney's closing argument. The evidence of his prior lawsuits should not have been admitted.

Though wrongly admitted, this evidence was accompanied by a limiting instruction, and that has a bearing on the harmless-error inquiry; we presume that "juries follow their

instructions." *Barber*, 725 F.3d at 717. But "[a]t some point judicial presumptions must give way to common sense, and the formulaic recitation of a pro forma limiting instruction may not suffice to cure an error." *Id*. Here, the prejudice engendered by the erroneous admission of the evidence of other lawsuits was significant enough that the presumption must give way. The defense attorney's questions on this subject were multiple and inflammatory. The repeated references to Nelson's other lawsuits during closing argument were clearly intended to undermine Nelson's credibility and stir juror bias against him as a chronic litigant. Indeed, the evidence of Nelson's other lawsuits went to the heart of the defense theory of the case: that Nelson had fabricated his story and was using it to "con" the jury into giving him money. The error was not harmless.

## C. Officer Novotny's Testimony

During Nelson's case-in-chief, Officer Novotny testified, consistent with his judicial admission, that he had no recollection of the traffic stop. On cross-examination, however, his attorney asked him to "tell the ladies and gentlemen of the jury some of the circumstances by which you pull a handgun on an individual in a traffic stop." Nelson objected, but the judge allowed Novotny to answer, though she gave the jury the following admonition: "Ladies and gentlemen, the testimony you are about to hear is general background information, it'll be very brief, and it's not intended to suggest that any of these circumstances existed on the evening in question. This witness has no recollection."

The testimony was not brief. Officer Novotny began by telling the jury that if "I felt for any reason that my safety was in jeopardy or my partner['s] safety was in jeopardy, by

all means, I would have my handgun out of the holster and at least in a 'ready' position." His attorney then asked him to explain the circumstances in which he might have good reason to point his gun at someone during a traffic stop. He answered,

> [I]f we ran the license plate and there was a LEADS message that contained the message that said "armed and dangerous," "known to fight with police," "known to try to disarm the police." These are all common messages that they attach to the LEADS message when you run a license plate.
>
> If for some reason the driver or the occupant was making [furtive] movements in the vehicle, meaning reaching under the seat, ignoring verbal direction, it would put us officers on high alert. We would definitely feel our safety was in jeopardy at that point. You know, it's a -- to obtain a weapon? You know, we don't know on the traffic stop.

That's not all. The defense attorney asked Officer Novotny to identify circumstances that might give an officer cause to search a stopped vehicle. He replied that if "our safety was in jeopardy"—say, for example, if the occupants made "[furtive] movements[,] … we could ask the occupants to exit the vehicle and do a plain-view search of the vehicle for weapons." He went on to explain why Nelson's description of the search was not believable:

> It would be such a disregard for safety if four officers -- if the only officers on the scene, I'm assuming, turn their backs on a subject who

was in cuffs for a reason that there was a risk already and for four people to ignore him and search a car, not to mention the fact that it wouldn't take four officers to search one vehicle. We would never practice anything like that.

Finally, Officer Novotny was asked to identify circumstances that might justify handcuffing the driver or a passenger during a traffic stop. He testified that "[i]f at that time they're not listening to verbal direction by keeping their hands where you know where they're at so they … wouldn't retrieve a weapon and then try to harm you or your partner."

In her posttrial ruling, the judge explained that this "background" testimony from Officer Novotny was admissible because it was "phrased in a clearly hypothetical fashion" and the risk of prejudice was low. She also observed that because the defendants "have no recollection of the incident in question, there is very little evidence they can offer beyond illustrating how Plaintiff's account of the incident departs from official procedure."

Nelson argues that admitting this testimony was reversible error, and again we largely agree. We note for starters that evidence of a person's "habit" is admissible to prove that he acted in accordance with the habit on a specific occasion, FED. R. EVID. 406, but neither the defendants nor the district court relied on this rule as a basis to pursue this line of questioning. That's understandable. "[B]efore a court may admit evidence of habit, the offering party must establish the degree of specificity and frequency of uniform response that ensures more than a mere 'tendency' to act in a

given manner, but rather, conduct that is 'semi-automatic' in nature." *Simplex, Inc. v. Diversified Energy Sys., Inc.*, 847 F.2d 1290, 1293 (7th Cir. 1988); *see also Thompson v. Boggs*, 33 F.3d 847, 854 (7th Cir. 1994) (noting the Federal Rules of Evidence Advisory Committee's position that habit "describes one's regular response to a repeated specific situation"). The defense never made this showing, and it's hard to see how Rule 406 can be applied in this particular context. A police officer's decision to draw his gun, use handcuffs, or search a car during a traffic stop can hardly be characterized as "habitual" or "semi-automatic." Indeed, the judge's instruction to the jury—that Officer Novotny's testimony was "not intended to convey what actually happened"—is inconsistent with the proper use of habit testimony, which *is* intended to show that the person acted in accordance with his habit on a particular occasion.

Nelson argues that Officer Novotny's "background" testimony was speculative and contradicted the defendants' judicial admissions that they had no recollection of stopping Nelson.[6] To evaluate this argument, it's helpful to divide Officer Novotny's testimony into three categories. The first is testimony that was flatly incompatible with the agreed facts

---

[6] "Judicial admissions are formal concessions in the pleadings, or stipulations by a party or its counsel, that are binding upon the party making them. … Indeed, they are 'not evidence at all but rather have the effect of withdrawing a fact from contention.'" *Keller v. United States*, 58 F.3d 1194, 1198 n.8 (7th Cir. 1995) (quoting [30B] MICHAEL H. GRAHAM, FEDERAL PRACTICE AND PROCEDURE: EVIDENCE § 6726 (Interim Ed.) (currently found at § 7026)).

of the case. This includes Officer Novotny's testimony that an officer would have his gun in the "ready" position if a LEADS warning indicated that a driver was "armed and dangerous," "known to fight with police," or "known to try to disarm police." As we've explained, the defendants entered formal judicial admissions that the LEADS database said nothing of the sort about Nelson, and the computer logs confirmed it. As a result, the "hypothetical" LEADS warnings Officer Novotny described could not possibly have made Nelson's account of the stop any more or less probable. This testimony should not have been permitted.

The second category is the testimony that directly contradicted specific parts of Nelson's account of the stop. This includes Officer Novotny's assertions that "it wouldn't take four officers to search one vehicle" and "[i]t would be such a disregard for safety if four officers [would] … turn their backs on a subject who was in cuffs." This testimony was relevant because it provided specific reasons, grounded in the officer's training and experience, to doubt some of the particulars of Nelson's account of the stop as he recounted it on the witness stand. Indeed, Nelson doesn't challenge the admission of these specific statements.

The third category includes testimony that was not conclusively refuted by judicial admission or undisputed evidence but also was not clearly related to the circumstances of Nelson's stop. For example, Officer Novotny testified that officers would put their guns in the ready position during a traffic stop if someone in the stopped car made furtive movements. He also testified that the driver of a stopped car might be handcuffed if he did not obey an officer's orders. In the context of this case, this testimony was entirely specula-

tive: It posits that *if* the events Nelson described actually happened—if guns were drawn, if he was handcuffed, if his car was searched, etc.—here are some possible factual circumstances that would provide justification. But of course Officer Novotny *doesn't know* if any of these things actually happened; none of the officers do. The only possible purpose and effect of this testimony was to invite the jury to speculate that Nelson acted in the ways Officer Novotny described.

And this speculative testimony was heavily prejudicial. Officer Novotny presented a worst-case scenario involving furtive movements, hidden weapons, and disobeyed orders, but without any reason to believe that Nelson engaged in this behavior, was otherwise dangerous, or that the officers' safety was threatened during this stop. Associating Nelson with this kind of suspicious behavior—without any factual basis whatsoever—was plainly prejudicial to him and likely stimulated sympathy for the officers. This testimony bore only a speculative link to Nelson's stop and should not have been permitted.

Was this testimony harmless? On one hand, the testimony was specifically framed as hypothetical, and the judge gave two limiting instructions to that effect. With respect to the LEADS testimony in particular, the jury had the defendants' judicial admissions as well as testimony from all four officers that the LEADS system did *not* in fact provide any reason to stop Nelson or to suppose that he might be armed and dangerous. On the other hand, as we've just explained, it was highly prejudicial to associate Nelson with the most dangerous class of suspects officers might encounter in a traffic stop.

If Officer Novotny's "background" testimony were the only evidentiary error at this trial, the harmlessness question might be closer. But harmlessness is evaluated "in light of the entire record," and "[w]here there are several errors, each of which is harmless in its own right, a new trial may still be granted if the cumulative effect of those otherwise harmless errors deprives a litigant of a fair trial." *Barber*, 725 F.3d at 715 (quotation marks omitted). We've already concluded that a new trial is warranted because other evidence was erroneously admitted. The error in admitting Officer Novotny's speculative testimony only bolsters that conclusion.

Accordingly, for all the foregoing reasons, the judgment is REVERSED, and the case is REMANDED for further proceedings consistent with this opinion.