[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 16-12007

_____

D.C. Docket No. 1:12-cv-01352-ODE


JACQUELINE STEVENS,

                                        Plaintiff - Appellant,

versus

U.S. ATTORNEY GENERAL,
JUAN OSUNA,
Director, Executive Office of Immigration Review,
in his official capacity,
FRAN MOONEY,
Assistant Director for the Office of Management Programs,
Executive Office of Immigration Review
in her individual and official capacity,
MARYBETH KELLER,
Assistant Chief Immigration Judge,
Executive Office of Immigration Review,
in her individual and official capacity,
GARY SMITH,
Assistant Chief Immigration Judge,
Executive Office of Immigration Review,
in his individual and official capacity, et al.,

                                        Defendants - Appellees,

INSPECTOR DOE,
Federal Protective Services, et al.,

                                        Defendants.

                        _____

                    Appeal from the United States District Court
                       for the Northern District of Georgia
                        _____

                            (December 15, 2017)

Before JULIE CARNES and EDMONDSON, Circuit Judges, and WILLIAMS,[*]
District Judge.

EDMONDSON, Circuit Judge:

       Plaintiff Jacqueline Stevens appeals the dismissal of claims she filed

pursuant to Bivens v. Six Unknown Named Agents of the Fed. Bureau of

Narcotics, 91 S. Ct. 1999 (1971).  Briefly stated, Plaintiff contends that her

constitutional rights were violated when she was denied access to hearings at the

Atlanta Immigration Court.  Plaintiff seeks monetary damages, as well as

injunctive and declaratory relief.  We affirm the district court's decision.

_____

[*] Honorable Kathleen M. Williams, United States District Judge for the Southern District of
Florida, sitting by designation.

I.    BACKGROUND

Plaintiff is a journalist and a university professor of political science.  Her area of study focuses on the due process rights of those persons involved in deportation proceedings and on the conduct of Immigration Judges within the Executive Office of Immigration Review ("EOIR").[1]  Before the occurrences underlying this civil action, Plaintiff had published criticisms of deportation proceedings in general and of Immigration Judge William Cassidy's performance in particular.

This civil action arises from two dates on which Plaintiff sought to attend immigration hearings at the Atlanta Immigration Court.[2]  On 7 October 2009,

---

[1] The EOIR is an agency that adjudicates immigration cases within the Department of Justice. Under authority delegated by the Attorney General, the EOIR is responsible for the interpretation and administration of federal immigration laws, and for conducting immigration court proceedings, appellate reviews, and administrative hearings.  THE UNITED STATES DEPARTMENT OF JUSTICE, EXECUTIVE OFFICE FOR IMMIGRATION REVIEW, https://www.justice.gov/eoir/about-office (last visited 14 December 2017).

[2]  Plaintiff contends on appeal that the district court erred by failing to consider (that is, failing to write about) Judge Cassidy's liability for cancelling hearings on 22 June 2009, 12-15 January 2010, and 15 April 2010.  This argument is unpersuasive for several reasons.

First, about the supposed cancellation of hearings on these dates, Plaintiff's amended complaint contains only one allegation: "Plaintiff was unable to observe deportation/removal hearings at the Immigration Court on June 22, 2009, January 12-15, 2010, and April 15, 2010, because upon information and belief, hearings were cancelled when it was determined that Plaintiff would likely be in attendance."  Plaintiff alleges no facts supporting her claim that the hearings were cancelled wrongfully or that Judge Cassidy (or any other Defendant) was responsible for or otherwise involved in cancelling the hearings.  Nowhere else in Plaintiff's amended complaint does she elaborate on the alleged supposedly improper cancellation of scheduled hearings: Plaintiff's counts for constitutional violations stem only from her alleged "wrongful exclusion"

3

Plaintiff wished to attend three hearings listed on Judge Cassidy's afternoon docket. One of the hearings was rescheduled at the request of respondent's lawyer. Judge Cassidy then closed to the public the remaining two hearings. Because Plaintiff was no party, family member, or attorney-of-record for the respondents in those cases, she was not permitted to observe the hearings.

On 19 April 2010, Plaintiff returned to the Atlanta Immigration Court and did observe morning hearings held before Judge Cassidy. The docket listed one additional hearing scheduled before Judge Cassidy for that afternoon. Judge Cassidy closed that hearing to the public and, accordingly, asked Plaintiff to leave the courtroom. In her complaint, Plaintiff alleged she was asked to leave the courtroom "shortly after 3 p.m." Plaintiff asked Judge Cassidy for a "legal reason"

---

from immigration hearings that were held and "forcible removal" from the court building. For the cancellation of hearings, Plaintiff's amended complaint, thus, contains no "short and plain statement" showing that she is entitled to relief, as required by Fed. R. Civ. P. 8(a)(2).

Second, Plaintiff first mentioned the cancellation of hearings in June 2009, January 2010, and April 2010 in her amended complaint, which was filed against Judge Cassidy in his official capacity only. Thus, even if Plaintiff's amended complaint could be construed as asserting a claim against Judge Cassidy for liability for the cancellation of hearings on those days, the claim is against Judge Cassidy only in his official capacity. The district court determined -- and the parties agreed -- that Plaintiff's damage claims against Judge Cassidy in his official capacity are barred by sovereign immunity.

Third, a district court commits no reversible error merely because the opinion explaining its order fails to address expressly one of the claims in a multi-count civil complaint. See Am. United Life Ins. Co. v. Martinez, 480 F.3d 1043, 1069-70 (11th Cir. 2007) (affirming the district court's dismissal of a claim despite the district court's failure to address the claim in its order of dismissal). After all, we can affirm a district court's ruling "for any reason supported by the record, even if not relied on by the district court." Cochran v. United States Health Care Fin. Admin., 291 F.3d 775, 778 n.3 (11th Cir. 2002).

for his request and referred him to 8 C.F.R. § 1003.27, which deals with the public's access to immigration hearings.  When Judge Cassidy repeated his request that Plaintiff leave his courtroom, Plaintiff asked whether the respondent had requested a closed hearing.  Judge Cassidy replied "no" and that the respondent was proceeding pro se.  Judge Cassidy then told Plaintiff that he could order security guards to remove her.  In response, Plaintiff asked Judge Cassidy again for "a legal reason for closing the hearing."  Judge Cassidy said "no," told Plaintiff to remain in the courtroom, and that he would return with the pertinent regulation.  Judge Cassidy then left the courtroom.  Plaintiff alleges her verbal exchange with Judge Cassidy lasted about 90 seconds and occurred in "normal conversational tones."  Plaintiff -- concerned that Judge Cassidy had returned to his chambers to order guards to remove her physically from the courtroom -- told Judge Cassidy's assistant that she would be waiting in the Immigration Court lobby in the event the respondent requested her presence as an observer.

Plaintiff moved to the Immigration Court lobby, where she complained to "an EOIR court staff member about Defendant Cassidy's unlawful actions" in closing the courtroom.  Plaintiff then began documenting the incident in her notebook.  Between 3:15 and 3:20 p.m., three building security guards[3] entered the

---

[3] The building security guards were employees of Paragon Systems, Inc., a private company contracted to provide security services for the Atlanta Immigration Court.  Although Plaintiff

5

lobby area.  One of the officers asked Plaintiff to leave the building; and after a brief verbal exchange, the guards escorted Plaintiff outside.  The parties dispute whether Plaintiff was removed from the building on Judge Cassidy's orders.  According to Plaintiff, she overheard one guard tell another guard that Judge Cassidy wanted her out of the building.[4]

Plaintiff filed this civil action in district court.  In pertinent part, Plaintiff purported to raise these claims:[5] (1) a Bivens claim for damages against Judge Cassidy in his individual capacity; (2) a claim for injunctive relief against all defendants, including Judge Cassidy; (3) Bivens claims for damages against Fran Mooney, Assistant Director of the EOIR's Office of Management Programs, in her individual capacity; and (4) a claim for declaratory judgment.

The district court dismissed Plaintiff's Bivens claim against Judge Cassidy in his individual capacity on grounds that Judge Cassidy was entitled to absolute judicial immunity.  The district court also concluded that Judge Cassidy was

---

named as defendants the three Paragon guards and a Paragon supervisor, those defendants are not parties to this appeal.

[4] For purposes of this appeal and the sake of argument, we will make two assumptions about the record (1) that the evidence in the record is sufficient to support a factual finding that Judge Cassidy directed the security guards to remove Plaintiff from the court building and (2) that Judge Cassidy in fact gave such a direction.

[5] In her complaint, Plaintiff sought to assert 8 counts against 13 different defendants; all claims were disposed of in a series of orders issued by the district court.  On appeal, Plaintiff challenges only the district court's dismissal of the claims identified here: the remaining, once-asserted claims are not before us on appeal.

entitled to judicial immunity from Plaintiff's claim for injunctive relief. About Plaintiff's claims for injunctive relief against the remaining defendants, the district court dismissed those claims for lack of standing. The district court also dismissed for failure to state a claim Plaintiff's Bivens claims against Mooney. The district court then declined to exercise jurisdiction over Plaintiff's claim for declaratory relief.

II.    STANDARD OF REVIEW

Whether an official is entitled to absolute immunity is a question of law that we review de novo. Mikko v. City of Atlanta, 857 F.3d 1136, 1142 (11th Cir. 2017). We also review de novo the district court's dismissal for failure to state a claim, accepting as true the factual allegations in the complaint and construing them in the light most favorable to the plaintiff. Butler v. Sheriff of Palm Beach Cnty., 685 F.3d 1261, 1265 (11th Cir. 2012). We review a district court's decision not to exercise jurisdiction over a claim for declaratory judgment under an abuse-of-discretion standard. Wilton v. Seven Falls Co., 515 U.S. 277, 289-90 (1995).

III.    DISCUSSION

    A.    <u>Absolute Judicial Immunity</u>

    1. <u>Immigration Judges</u>

"Few doctrines were more solidly established at common law than the immunity of judges from liability for damages for acts committed within their judicial jurisdiction." <u>Cleavinger v. Saxner</u>, 474 U.S. 193, 199 (1985).  The immunity applies even when the judge's conduct "was in error, was done maliciously, or was in excess of his authority . . . ." <u>Stump v. Sparkman</u>, 435 U.S. 349, 356-57 (1978).

This absolute immunity is intended "for the benefit of the public, whose interest it is that the judges should be at liberty to exercise their functions with independence and without fear of consequences." <u>Pierson v. Ray</u>, 386 U.S. 547, 554 (1967).  A judge has a duty to decide all cases brought before him, including those cases that are controversial and that may "arouse the most intense feelings in the litigants." <u>Id</u>.  A judge's "errors may be corrected on appeal, but he should not have to fear that unsatisfied litigants may hound him with litigation charging malice or corruption.  Imposing such a burden on judges would contribute not to

8

principled and fearless decision-making but to intimidation."  Id.; see also

Forrester v. White, 484 U.S. 219, 226-27 (1988) ("If judges were personally liable

for erroneous decisions, the resulting avalanche of suits, most of them frivolous but

vexatious, would provide powerful incentives for judges to avoid rendering

decisions likely to provoke such suits.  The resulting timidity would be hard to

detect or control, and it would manifestly detract from independent and impartial

adjudication." (citation omitted)).

Absolute immunity is not reserved for Article III judges only.  "Absolute

immunity flows not from rank or title or 'location within the Government,' but

from the nature of the responsibilities of the individual official."  Cleavinger, 474

U.S. at 201 (citation omitted).  The Supreme Court has thus applied a "functional

approach" in determining whether an official is entitled to absolute immunity.  Id.;

Butz v. Economou, 438 U.S. 478, 512-13 (1978).  Factors to consider in deciding

whether to apply absolute immunity to a particular person include these elements:

> (a) the need to assure that the individual can perform his functions
> without harassment or intimidation; (b) the presence of safeguards
> that reduce the need for private damages actions as a means of
> controlling unconstitutional conduct; (c) insulation from political
> influence; (d) the importance of precedent; (e) the adversary nature of
> the process; and (f) the correctability of error on appeal.

Cleavinger, 474 U.S. at 202 (citing Butz, 438 U.S. at 512).

In the light of these considerations -- as well as the public policy underlying

the doctrine -- absolute immunity has been extended to state court judges, Pierson,

9

386 U.S. 547, administrative law judges and federal hearing examiners, Butz, 438 U.S. at 514, federal and state prosecutors, Imbler v. Pachtman, 424 U.S. 409 (1976); Yaselli v. Goff, 275 U.S. 503 (1927), aff'g 12 F.2d 396 (2d Cir. 1926), grand jurors, see Imbler, 424 U.S. at 423 n.20, and to witnesses testifying in judicial proceedings, Briscoe v. Lahue, 460 U.S. 325 (1983).

In considering whether the doctrine of absolute judicial immunity extends properly to Immigration Judges, we are guided by the Supreme Court's decisions in Butz and in Cleavinger. We first recognize that -- as with judges of general jurisdiction and with administrative law judges -- Immigration Judges are tasked with resolving cases that "are every bit as fractious as those which come to court." See Butz, 438 U.S. at 513. That immigration proceedings are adversarial in nature and often involve controversial issues of extreme significance to those persons involved underscores the importance of preserving the Immigration Judge's independence. Cf. Stump, 435 U.S. at 364 ("The fact that the issue before the judge is a controversial one is all the more reason that he should be able to act without fear of suit.").

We also see an Immigration Judge's role in immigration proceedings as sufficiently "functionally comparable" to that of a judge. Immigration Judges possess many of the same powers as a trial judge. These powers include the power to subpoena witnesses and evidence, to administer oaths, to receive and rule on

evidence, to question parties and witnesses, to issue sanctions, to make credibility determinations, and to render decisions.  See 8 U.S.C. § 1229a(b)(1), (c); 8 C.F.R. §§ 1003.10(b), 1003.35.

In addition, the structure of immigration proceedings contains many safeguards -- similar (although not always identical) to those discussed in Butz in the context of administrative hearings[6] -- that tend to reduce the risk of unchecked unconstitutional conduct by Immigration Judges.  Immigration Judges are professional hearing officers.  In deciding cases before them, Immigration Judges are required to exercise "independent judgment and discretion" and to resolve issues in an "impartial manner."  8 C.F.R. § 1003.10(a), (b).  Immigration Judges are also bound both by agency precedent, 8 C.F.R. § 1003.1(g), and by precedent established by the federal appellate courts.  Parties to an immigration hearing may be represented by counsel, 8 C.F.R. § 1003.16, may present documentary evidence and witness testimony, 8 C.F.R. §§ 1003.31, 1003.34, 1003.35, and are entitled to written notice of the Immigration Judge's decision which "shall" include reasons for the decision, 8 C.F.R. §§ 1003.37, 1240.12(a), 1240.13(a).  Parties may also seek review of the Immigration Judge's decision by the Board of Immigration

---

[6] The administrative hearing process considered by the Supreme Court in Butz was governed by the Administrative Procedure Act, 5 U.S.C. § 551 et seq.; an Act which is not applicable to the immigration proceedings considered in this appeal.

11

Appeals ("BIA") and, if necessary, by the federal courts.  See 8 U.S.C. § 1252; 8 C.F.R. § 1003.38.[7]

That immigration proceedings do not contain safeguards identical to those safeguards identified by the Supreme Court in Butz is not outcome determinative here.  The Supreme Court's opinion in Cleavinger demonstrates that Butz does not wholly define the limits of judicial-immunity availability.  In determining whether members of a prison discipline committee were entitled to absolute immunity, the Supreme Court compared the procedural safeguards available under the prison's disciplinary policy to those discussed in Butz.  Cleavinger, 474 U.S. at 203-06.  Although the Supreme Court concluded ultimately that the prison policy's procedural safeguards were insufficient to warrant absolute immunity, no individual safeguard or combination -- or lack thereof -- was strictly determinative.  See id.

That having been said, we find it instructive that many of the safeguards pointed out as absent in Cleavinger are present here.  For instance, the Supreme Court in Cleavinger cared about the lack of these procedural safeguards: (1) that prisoners subject to the prison's disciplinary policy were "afforded neither a lawyer nor an independent nonstaff representative;" (2) that prisoners had "no right to

_____

[7] In addition to the existence of procedural safeguards governing immigration proceedings, the Office of the Chief Immigration Judge also provides expressly a process by which persons -- including non-parties -- can complain about an Immigration Judge's conduct.  See THE UNITED STATES DEPARTMENT OF JUSTICE, EXECUTIVE OFFICE FOR IMMIGRATION REVIEW, https://www.justice.gov/sites/default/files/eoir/legacy/2013/05/23/IJComplaintProcess.pdf.

12

compel the attendance of witnesses or to cross-examine;" (3) that prisoners had "no right to discovery;" (4) that "[t]here was no cognizable burden of proof;" (5) that "[n]o verbatim transcript was afforded;" and (6) that "[i]nformation presented often was hearsay or self-serving." Id. at 206.

Aliens in deportation proceedings, however, have a right to representation by a lawyer, the right to examine evidence against them, and the right to cross-examine witnesses. 8 U.S.C. § 1229a(b)(4)(A), (B). The immigration court is also required to maintain a complete record -- including a "verbatim" recording -- of all testimony and evidence presented at the hearing. 8 U.S.C. § 1229a(b)(4)(C); 8 C.F.R. § 1240.9. In addition, immigration proceedings are governed by a statutorily-proscribed burden of proof. 8 U.S.C. § 1229a(c).

The Supreme Court in Cleavinger also expressed concern that the members of the disciplinary committee lacked independence. 474 U.S. at 203-04, 206. The Supreme Court specially noticed that the committee members were "not professional hearing officers." Id. at 204. And, because the committee members remained employees of the Bureau of Prisons, "they [were] direct subordinates of the warden who reviews their decision." Id. The committee members were often responsible for resolving disputes -- including making credibility determinations -- between the inmate over whom they sat in judgment and the fellow employee who had lodged the disciplinary charge. Id. The committee members were "thus under

13

obvious pressure to resolve a disciplinary dispute in favor of the institution and their fellow employee." Id. ("It is the old situational problem of the relationship between the keeper and the kept, a relationship that hardly is conducive to a truly adjudicative performance.").

Immigration Judges, meanwhile, are under the supervision and direction of the Chief Immigration Judge, who has "no authority to direct the result of an adjudication assigned to another immigration judge." 8 C.F.R. § 1003.9(b), (c). And an Immigration Judge's decisions are reviewed on appeal by the BIA: a division of the EOIR separate and apart from the Office of the Chief Immigration Judge and with no direct supervisory authority over Immigration Judges. See 8 C.F.R. § 1003.1. Immigration Judges are also independent of the agency responsible for enforcing the federal immigration laws: the United States Citizenship and Immigration Services. See THE UNITED STATES DEPARTMENT OF JUSTICE, EXECUTIVE OFFICE FOR IMMIGRATION REVIEW, https://www.justice.gov/eoir/about-office (last visited 14 December 2017). Given these structural safeguards, immigration proceedings do not involve the same potential for institutional bias as recognized in Cleavinger: no "relationship between the keeper and the kept."

Considering both the adjudicatory role that Immigration Judges play within the immigration-hearing process and the existence of what we view -- in the light

14

of the Supreme Court's guidance -- as sufficient pertinent safeguards, we are persuaded that Immigration Judges are judges entitled to absolute immunity for their judicial acts, without regard to the motive with which those acts are allegedly performed.  And we underline that absolute immunity is not merely a defense to liability: it is an immunity from suit and from "the other burdens of litigation" that "is effectively lost if a case is erroneously permitted to go to trial."  Cf. Mitchell v. Forsyth, 472 U.S. 511, 526 (1985).

### 2.  Judge Cassidy's Entitlement to Absolute Immunity

Having determined that the doctrine of absolute judicial immunity applies to Immigration Judges, we next decide whether Judge Cassidy's complained-of conduct -- excluding Plaintiff from both a courtroom and from the courthouse -- falls within the scope of that immunity.  A judge acting within his judicial capacity is unentitled to absolute judicial immunity -- and, thus, is subject to suit and to civil liability -- only when he acts in the "clear absence of all jurisdiction."  See Stump, 435 U.S. at 356-57.  Here, we must determine whether Judge Cassidy acted in his judicial capacity and, if so, whether he acted in the "clear absence of all jurisdiction."

15

In determining whether a judge's act is "judicial" for purposes of immunity, we consider (1) whether the act is one normally performed by judges, and (2) whether the complaining party was dealing with the judge in his judicial capacity.  Id. at 362.

About the first element, the Supreme Court has instructed that we look only to "the nature and function of the act, not the act itself."  Mireles v. Waco, 502 U.S. 9, 13 (1991) (quotations omitted); see also Forrester v. White, 484 U.S. 219, 229 (1988) (the Court's immunity analysis is informed by "the nature of the function performed").  If we were to examine, instead, the factual details of the particular act being challenged, "then any mistake of a judge in excess of his authority would become a 'nonjudicial' act, because an improper or erroneous act cannot be said to be normally performed by a judge."  Mireles, 502 U.S. at 12 (determining that the pertinent "act" was "the function of directing police officers to bring counsel in a pending case before the court": not "a judge's direction to police officers to carry out a judicial order with excessive force").  "If judicial immunity means anything, it means that a judge will not be deprived of immunity because the action he took was in error or was in excess of his authority."  Id. at 12-13 (quotations and alterations omitted).

16

Judge Cassidy's decisions to close particular immigration hearings to the public -- and to exclude Plaintiff from the courtroom -- were decisions made in the direct exercise of the judicial function.

If Judge Cassidy ordered Plaintiff removed from the court building, he was also engaged in performing a judicial function. Judges have an obligation to maintain control over the courthouse and over the conduct of persons in the courthouse; the issuance of an order removing persons from the courthouse in the interest of maintaining such control is an ordinary function performed by judges: for example,[8] where a person might not be complying with a court order or might be impeding the judicial proceeding.[9] Cf. Sheppard v. Maxwell, 384 U.S. 333, 358 (1966) ("the courtroom and courthouse premises are subject to the control of the court"); United States v. Smith, 426 F.3d 567, 569, 576 (2d Cir. 2005) (stressing

---

[8] These circumstances are not necessarily the only circumstances in which public access (or access by a particular person) might be denied to court proceedings or to a courthouse – in the exercise of the judicial function by a judge acting in his judicial capacity.

[9] We reject the position that a judge's ordering a person removed from a courthouse constitutes an administrative, legislative, or executive (apart from a judicial) function. A judge's authority to control his courtroom -- and, necessarily, the environment surrounding his courtroom -- stems directly from his duties as a judge. For background, see Forrester v. White, 484 U.S. 219 (1988) (discussing the distinction between judicial acts and a judge's administrative, legislative, and executive functions). See also Barrett v. Harrington, 130 F.3d 246, 256 n.11 (6th Cir. 1997) ("a judge acts in a judicial capacity when exercising control of the judge's courtroom." (citing Sheppard v. Maxwell, 384 U.S. 333 (1966))); Gregory v. Thompson, 500 F.2d 59, 64 (9th Cir. 1974) (denying absolute immunity to a judge who personally used physical force to remove an observer from the courtroom -- an act performed "normally" by a sheriff or a bailiff -- but explaining that judges have an "obligation" to "protect the sanctity and dignity of courtroom proceedings" and that the judge should have, instead, summoned a sheriff to escort the observer from the courtroom).

17

the importance that the judiciary -- not the Marshals Service -- play the primary

role in controlling access to federal buildings containing courtrooms); United

States v. Ulan, 421 F.2d 787, 788 (2d Cir. 1970) (appeal from a conviction for

assaulting and interfering with a U.S. Deputy Marshal, which arose after a district

court judge ordered the Marshals to clear the courtroom and to escort all

demonstrators outside the courthouse); Richman v. Sheahan, 512 F.3d 876, 880

(7th Cir. 2008) (a state court judge ordered the son of a woman contesting a traffic

ticket to leave the court building and, when he refused, ordered court security

officers to arrest the man for contempt); United States v. Brugnara, 856 F.3d 1198,

1205 (9th Cir. 2017) (district court judge ordered a belligerent juror removed from

the building); State v. Bush, 714 P.2d 818, 823 (Ariz. 1986) ("the trial judge has

the primary responsibility for controlling the conduct of spectators in the

courtroom and the courthouse" and, if necessary, "may clear the courtroom and the

courthouse of those who may be intimidating witnesses or other court

personnel.").[10]

Moreover, Judge Cassidy's supposed order to remove Plaintiff from the

building "arose directly and immediately out of" Judge Cassidy's dealings with

---

[10] These cases involve no claim of absolute judicial immunity. Thus, that the particular facts of these cases may differ from the facts involved in this appeal does not change our immunity analysis. We cite these cases only for the proposition that judges have an obligation to maintain control over their courtroom and courthouse: to illustrate that the act of ordering a person -- including a member of the press, demonstrator, or other observer -- removed from a court building is one performed "normally" by judges.

Plaintiff in his judicial capacity: directing Plaintiff only moments earlier to leave his courtroom after closing to the public the immigration hearing.[11] See Stump, 435 U.S. at 361 (a factor tending to show that a judge acted within his judicial capacity is if "the confrontation arose directly and immediately out of a visit to the judge in his official capacity" (citing with approval McAlester v. Brown, 469 F.2d 1280, 1282 (5th Cir. 1972))). We stress that -- for purposes of our immunity analysis -- we need not decide (and do not decide) whether Judge Cassidy's decision, in this instance, to have Plaintiff removed from the court building was without error: that Judge Cassidy, on the pertinent afternoon, was acting within the scope of his judicial capacity when he dealt with Plaintiff is adequate.

Next, we reject Plaintiff's contention that Judge Cassidy acted in the "clear absence of all jurisdiction." The parties do not dispute that Immigration Judges

---

[11] Construing the record in Plaintiff's favor, we cannot conclude that Judge Cassidy's supposed order to have Plaintiff removed from the court building was separate and distinct, with no overlap, from his request that Plaintiff leave his courtroom. The two events were separated in time -- at most -- by about fifteen minutes. Furthermore, when Judge Cassidy returned to his chambers and supposedly ordered guards to remove Plaintiff from the building, he had just directed Plaintiff twice to leave the courtroom and told Plaintiff that he could order guards to remove her. Although Plaintiff denies that she refused flatly to leave the courtroom, she does not dispute that she questioned the judge's authority there or that she continued to remain in the courtroom -- despite Judge Cassidy's requests for her to leave and warning he would summon guards to remove her -- until after Judge Cassidy had left the courtroom himself and he appeared to Plaintiff to be calling security. Upon her leaving the courtroom and entering the Immigration Court lobby, Plaintiff continued to complain to a court staff member about the legality of Judge Cassidy's decision to close the hearing. She was still in the process of documenting the incident when guards arrived to escort her out of the building. Given Plaintiff's story on how the events progressed, we see no clear-cut important break in the train between Judge Cassidy's two supposed orders: the pertinent events of this single-afternoon's occurrence are -- temporally and logically -- linked to Plaintiff's words and conduct in front of Judge Cassidy and his order closing certain courtroom proceedings to the public.

have express authority to order a hearing closed to the public under certain circumstances, including "for the purpose of protecting witnesses, parties, or the public interest." See 8 C.F.R. § 1003.27. Again, we need not decide (and do not decide) today whether Judge Cassidy's decision, in this instance, to close the hearings in the pertinent cases was correct: we decide that Immigration Judges possess the authority to close hearings. See Dykes v. Hosemann, 776 F.2d 942, 947 (11th Cir. 1985) (rejecting the argument that a judge acted in the "clear absence of all jurisdiction" when he issued an erroneous ruling: that a judge's ruling may have been in error "does not affect the fact that it was within his power to make that determination.").

In addition, even if Judge Cassidy lacked express statutory or regulatory authority to order Plaintiff removed from the court building, Judge Cassidy acted in no "clear absence of all jurisdiction" in doing so. Immigration Judges do have express authority to "regulate the course" of removal hearings. See 8 C.F.R. §§ 1240.1(c), 1240.9. This authority triggers obligation. Based on this authority, the EOIR has recognized "that at times an Immigration Judge must be firm and decisive to maintain courtroom control." See THE UNITED STATES DEPARTMENT OF JUSTICE, EXECUTIVE OFFICE FOR IMMIGRATION REVIEW, Ethics and Professionalism Guide for Immigration Judges, at 3, https://www.justice.gov/sites/default/files/eoir/legacy/2013/05/23/EthicsandProfessionalismGuideforIJs.pdf.

We decline to say -- as a matter of law -- that an Immigration Judge's authority and obligation to maintain control over his courtroom vanishes at the threshold of the courtroom door.  We oppose such an impractical, sharp-edged rule.  Instead, an Immigration Judge's express power over his courtroom implies necessarily the power to remove a person from the courtroom (and court building): for example, when a person might be perceived to threaten the integrity of judicial proceedings.  The law has long accepted that, "[t]he grantor of anything to another, grants that also without which the thing granted would be useless."  S.S. Peloubet, A Collection of Legal Maxims in Law and Equity 43 (Rothman 1985) (1884) ("Cuicunque aliquis quid concedit, concedere videtur et id sine quo res ipsa esse non potuit.").  A judge's authority to maintain control of his courtroom extends to the court building.  See Sheppard, 384 U.S. at 358 (a case in which the Supreme Court discussed a trial court's "duty" and "responsibility" to control news gatherers stationed inside the courtroom and throughout the court building).

When judges believe that their immunity protection from private lawsuits can evaporate in novel situations or in heated controversies calling for a judge to act with discretion, the very reason for immunity is undercut: judges begin to think not only of what the law demands, but what is easiest and best for the judge, personally, and for the family finances -- and judicial independence is jeopardized. For immunity to be useful to protect judges from intimidation by threatened,

21

personally-burdensome lawsuits connected to the judge's acts of discretion, the Supreme Court has told us that "the scope of a judge's jurisdiction must be construed broadly": a judge is not deprived of immunity merely because he acts in excess of his authority.  See Stump, 435 U.S. at 356-57.  So -- even if we are mistaken about the exact perimeter of an Immigration Judge's authority -- we conclude Judge Cassidy did not act in the "clear absence of all jurisdiction" in directing that Plaintiff be removed from the court building; given the assumed state of affairs on the afternoon of 19 April 2010, enough connection to judicial proceedings was present.[12]

---

[12] Plaintiff contends that -- because the building security guards who escorted her from the court building were no employees of the EOIR or the Department of Justice -- Judge Cassidy acted in the "clear absence of all jurisdiction" when he supposedly ordered the security guards to remove Plaintiff from the building.

The question of whether the security guards were obliged by law to carry out a supposed direction from Judge Cassidy is a different question than whether Judge Cassidy gave the direction while acting in his judicial capacity or in the "clear absence of all jurisdiction" for purposes of immunity.  For example, we suspect that a judge could correctly call on private-citizen passersby to assist in maintaining peace and order around the courtroom in some circumstances.  Whether these private citizens would be obliged to do so might be questionable.  But that the judge would be acting in a judicial capacity and not clearly in the absence of all jurisdiction would not be questionable at all.

If Judge Cassidy had no official authority over the building security guards, that circumstance does not change our decision about immunity.  In Mireles v. Waco, 502 U.S. 9 (1991), the Supreme Court concluded that a state court judge acted within his judicial capacity -- and not in the "complete absence of all jurisdiction" -- when the judge allegedly ordered two police officers to use excessive force to seize plaintiff (a lawyer who had failed to appear timely in the courtroom) and to bring plaintiff forcibly into the judge's courtroom.  Among other things, the Supreme Court rejected the assertion that the fact that the judge's order was carried out by police officers somehow rendered the judge's act "executive" in character.  502 U.S. at 12-13 (likening the judge's direction to the police officers to a "judge's issuance of a warrant for an executive officer to search a home," which the Court described as an "unquestionably" judicial act).

22

Because Judge Cassidy was acting within his judicial capacity -- and not in the "clear absence of all jurisdiction" -- we affirm the district court's determination that Judge Cassidy was entitled to the absolute immunity of a judge.

*About injunctive relief*

Absolute immunity protects Judge Cassidy both from Plaintiff's Bivens claim seeking money damages and also the claim for injunctive relief.  See Bolin v. Story, 225 F.3d 1234, 1240-42 (11th Cir. 2000).[13]

In Bolin, we decided that judicial immunity can bar claims for injunctive relief as well as for damages.  Plaintiff plays up that Bolin involved Article III judges (including Circuit Judges) and points out that Immigration Judges are not identically situated.  We take the point.  And we accept that some of the reasoning in Bolin would not apply to the case of Immigration Judges.  But we think the most

Moreover, even to the extent the judge exceeded his authority in authorizing or ratifying the officers' use of excessive force, the Supreme Court concluded the judge's act -- "taken in the very aid of the judge's jurisdiction over a matter before him" -- was not taken in the clear absence of jurisdiction.  Id. at 13.

[13] Plaintiff's contention that she has no other remedy to review Judge Cassidy's conduct is inaccurate: a formal administrative process is available for filing complaints against an Immigration Judge.  Plaintiff availed herself of that remedy.  That the result reached by the process, in this instance, was not pleasing to Plaintiff does not establish the process is inadequate as a check on possible misconduct by Immigration Judges.

23

important ideas do apply, and the conclusion is on the same line:  immunity bars injunctive relief against Immigration Judges.

Litigation puts the weight of time, trouble, and expense on the attacked judge whether the plaintiff seeks damages or an injunction at the end of the action. To be entangled in litigation is a distraction and more.  Also, if a plaintiff wins an injunction, the judge faces the threat of more time, trouble, and expense of defending against accusations that the judge is later in violation of the injunction and faces the threat of contempt punishments, including incarceration maybe.  We stress that it is the threat of private parties instituting actions and proceedings (and not just the possibility that the judge will be a losing party in those actions/proceedings) that carries with it the chilling potential for judges as they work.

None of this hauling judges into court by private parties seems likely to advance the goal of fearless decision making by judges facing the obligation to make difficult decisions in intensely contentious situations.  Without strong immunity to protect judges in their work, it would be too easy for the judges' critics (and many judges, if they have served long, have critics) to hound the judges, by threatened litigation, to the point of actual interference -- conscious or unconscious -- in judicial decision making.  The rule of the Bolin case covers Immigration Judges, too.

24

B.    Claims Against Remaining Individual Defendants

1.  Bivens Damages Claims

Plaintiff next challenges the district court's dismissal, pursuant to Fed. R.

Civ. P. 12(b)(6), of her Bivens damages claims against Mooney.[14]  In dismissing

Plaintiff's claims, the district court determined that the allegations in Plaintiff's

complaint were insufficient to show that Mooney had violated the Constitution.

A complaint must contain "a short and plain statement of the claim showing

that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2).  To survive dismissal

for failure to state a claim, "a plaintiff's obligation to provide the grounds of his

entitlement to relief requires more than labels and conclusions, and a formulaic

recitation of the elements of a cause of action will not do."  Bell Atl. Corp. v.

Twombly, 550 U.S. 544, 555 (2007) (quotations omitted).  Instead, "a complaint

must contain sufficient factual matter, accepted as true, to state a claim to relief

---

[14] In Plaintiff's appellate brief, the heading for this portion of her argument includes "Defendant Mooney and the Other Federal Defendants."  Likewise, in the "Statement of the Issues" and "Summary of the Argument" sections of Plaintiff's brief, Plaintiff refers to both Mooney and to "the other government defendants."  Despite these passing references, however, Plaintiff raises no substantive argument challenging the dismissal of her Bivens damages claims against any defendant other than Mooney.  As a result, the claims against other people are not before us on appeal.  See Sapuppo v. Allstate Floridian Ins. Co., 739 F.3d 678, 681 ("[A]n appellant abandons a claim when he either makes only passing references to it or raises it in a perfunctory manner without supporting arguments and authority.").

25

that is plausible on its face."  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009)

(quotation omitted).  To state a claim for relief under Bivens, "a plaintiff must

plead that each Government-official defendant, through the official's own

individual actions, has violated the Constitution."  Id. at 676 (emphasis added).

Mooney is liable only for her own misconduct, if any.  About Mooney's

individual conduct, Plaintiff's amended complaint alleges only that on 19 April

2010, EOIR's public affairs officer sent an email to several EOIR employees -- one

of whom then forwarded the email to Mooney -- notifying them that Plaintiff was

at the Atlanta Immigration Court.  Alleging the mere passive receipt of an email

alleges no misconduct on Mooney's part and is insufficient to show that Mooney

violated Plaintiff's constitutional rights.[15]  Plaintiff's complaint contains only one

---

[15] We have read Plaintiff's complaint (as she and her lawyers had amended it) and have construed the factual allegations in her favor, and we find no "plain statement" about how Mooney's individual conduct in fact caused Plaintiff's alleged injuries in this case.  For example, Plaintiff has made no allegation that Mooney, in fact, instructed, directed, or ordered someone to escort Plaintiff out of the court building.  Nor has Plaintiff alleged that Mooney actually had prior knowledge of Plaintiff's wrongful removal from the building but failed to intervene.  Cf. Keating v. City of Miami, 598 F.3d 753, 763-64 (11th Cir. 2010) (allegations that supervising officers approved orders permitting subordinate officers to discharge weapons, or directed subordinate officers to discharge weapons, were sufficient to satisfy the pleading requirement because the allegations established a causal connection between the supervising officers' conduct and plaintiffs' alleged injuries); Gonzalez v. Reno, 325 F.3d 1228, 1235 (11th Cir. 2003) (a causal connection between a supervisor's conduct and the alleged constitutional violation may be "established by facts which support an inference that the supervisor directed the subordinates to act unlawfully or knew that the subordinates would act unlawfully and failed to stop them from doing so.").  We cite these examples only to explain the kinds of straightforward allegations of fact that might satisfy the federal pleading requirement, not to suggest that particular allegations or words are necessary to state a claim for relief.  By the way, the complaint also contains no allegation that Mooney was stationed in Atlanta, was present in Atlanta on the pertinent day, or otherwise witnessed the complained-of conduct.

other factual allegation specific to Mooney: identifying Mooney as EOIR's

"Assistant Director for the Office of Management Programs" who, at all particular

times, was "responsible for security, space and facilities."  To be a supervisor is

not wrongful.  In addition, Plaintiff's unsupported conclusory assertions that

Defendants generally -- including Mooney -- "caused, participated in, condoned, or

covered up" various alleged wrongs also fail to satisfy the federal pleading

standard.  See Iqbal, 556 U.S. at 678 ("Threadbare recitals of the elements of a

cause of action, supported by mere conclusory statements, do not suffice.").

Without more "factual enhancements" about Mooney, the complaint at most

hints only at some possibility of Plaintiff's entitlement to relief against Mooney:

no showing per Rule 8 that Plaintiff is entitled.  See id.; Twombly, 550 U.S. at 557.

We affirm the district court's Rule 12(b)(6) dismissal.[16]

---

[16] On appeal, Plaintiff seeks to demonstrate Mooney's personal involvement in the alleged
constitutional violations by relying on deposition testimony.  The district court, however,
dismissed Plaintiff's Bivens claims against Mooney pursuant to Rule 12(b)(6), without
considering material outside the complaint.  In reviewing the district court's ruling, therefore, we
also look only to factual allegations in the complaint to determine whether Plaintiff stated a
claim for relief.  See Speaker v. United States HHS CDC & Prevention, 623 F.3d 1371, 1379
(11th Cir. 2010) ("In appeals of Rule 12(b)(6) dismissals, it is generally true that the scope of the
review must be limited to the four corners of the complaint." (quotation omitted)).

2.  Claims for Injunctive Relief

In her complaint, Plaintiff sought permanent injunctive relief, enjoining the defendants "from unlawfully excluding Plaintiff from Defendant Cassidy's courtroom" and "from excluding, removing or causing the exclusion or removal of Plaintiff from any federal facility within this Court's jurisdiction, where deportation/removal hearings are conducted, as to which Plaintiff has a lawful right of access."

The district court dismissed for lack of standing Plaintiff's claim for injunctive relief against the individual government defendants, including Mooney. Given the district court's earlier determination that Plaintiff failed to allege facts sufficient to demonstrate that each defendant had committed a constitutional violation, the district court concluded that Plaintiff also failed to demonstrate the requisite past or threat of future personal injury necessary to establish standing.

"[T]o establish Article III standing, a plaintiff must allege personal injury fairly traceable to the defendant's allegedly unlawful conduct and likely to be redressed by the requested relief." Dep't of Commerce v. United States House of Representatives, 525 U.S. 316, 329 (1999). To satisfy this standing requirement, a plaintiff seeking prospective injunctive relief must "allege facts from which it

28

appears there is a substantial likelihood that he will suffer injury in the future." Strickland v. Alexander, 772 F.3d 876, 883 (11th Cir. 2014).

In this appeal, we have already determined that Plaintiff failed to allege facts sufficient to demonstrate a constitutional violation by Mooney in the past. Plaintiff has also alleged no facts that would demonstrate a "substantial likelihood" that she would suffer an injury "fairly traceable" to Mooney in the future. Plaintiff has thus failed to establish Article III standing to seek to enjoin Mooney. See id.

To the extent that Plaintiff challenges the dismissal of her injunctive relief claim against "Other Administrators,"[17] her argument also fails. As we have already noted, Plaintiff, on appeal, raises no meaningful challenge to the district court's determination that Plaintiff failed to show a past constitutional injury caused by these other defendants. Nor did she allege facts sufficient to demonstrate that she is likely to suffer a personal injury in the future that is either fairly traceable to an individual defendant's unlawful conduct or that is redressable by the requested injunction. The district court committed no error in dismissing Plaintiff's injunctive relief claim for lack of standing.

---

[17] We construe the term "Other Administrators" to mean Defendants Eric Holder, Juan Osuna, MaryBeth Keller, Gary Smith, Cynthia Long, and Darren Eugene Summers.

C.    Declaratory Judgment

Plaintiff contends that the district court abused its discretion in declining to grant her declaratory judgment claim.

The Declaratory Judgment Act confers on federal courts a "unique and substantial discretion in deciding whether to declare the rights of litigants." Wilton, 515 U.S. at 286. "The statute's textual commitment to discretion, and the breadth of leeway [the Supreme Court] has always understood it to suggest, distinguish the declaratory judgment context from other areas of the law in which concepts of discretion surface." Id. at 286-87.

The Declaratory Judgment Act has been characterized as an "enabling Act," giving the district courts discretion to grant a new form of relief. Id. at 287-88. The Act, however, confers no "absolute right upon the litigant" and imposes no duty on the district courts. Id. Thus -- even when a civil action satisfies federal subject matter jurisdictional prerequisites -- a district court still maintains discretion about "whether and when to entertain an action under the Declaratory Judgment Act." Id. at 282; see also Brillhart v. Excess Ins. Co. of Amer., 316 U.S. 491, 494 (1942) ("Although the District Court had jurisdiction of the suit under the Federal Declaratory Judgments Act, it was under no compulsion to exercise that jurisdiction."). "In the declaratory judgment context, the normal principle that

30

federal courts should adjudicate claims within their jurisdiction yields to considerations of practicality and wise judicial administration." Wilton, 515 U.S. at 288.  And we must be mindful that the "facts bearing on the usefulness of the declaratory judgment remedy, and the fitness of the case for resolution, are peculiarly within [the district court's] grasp." See id. at 289.

With this law in mind, we now consider the district court's ruling in this case.  Plaintiff's complaint included two seemingly different requests for declaratory relief.[18]  On appeal, however, Plaintiff asserts only that the district court erred in failing to consider the following relief set out in Plaintiff's complaint:

> That [the district court] require that, where a deportation/removal hearing is partially or completely closed to the public, the immigration judge make specific findings on the record documenting the reasons for closure in order that a reviewing court can determine whether closure was lawful and whether less restrictive alternatives existed.

In response to the district court's show-cause order, Plaintiff put the request for declaratory judgment in a different way: "that hearings administered by the [EOIR] may not be closed to the public unless and until the presiding immigration judge

---

[18] In Count VII of Plaintiff's complaint -- titled "Declaratory Judgment" -- Plaintiff sought a declaration "that Plaintiff, the public and the press have the right, under the United States Constitution and federal law, to attend, observe, take notes on and report on deportation/removal hearings, to the extent authorized by the Constitution and federal law."  In the Complaint's "Prayer for Relief," Plaintiff requested both the declaration set out in Count VII and the relief asserted on appeal: a declaration that the Immigration Judge be required to make specific findings on the record documenting the reasons for closing an immigration hearing to the public.

31

makes a public <u>on the record determination</u> that closure is warranted under

8 C.F.R. § 1003.27." (some emphasis added).[19]

As an initial matter, in the light of the different -- and evolving -- requests

for relief sought in Plaintiff's complaint and in Plaintiff's response to the district

court's show-cause order, we cannot say that the district court characterized

unreasonably Plaintiff's request as "unclear" and "amorphous and abstract."  We

accept that a plaintiff's failure to state definitely and consistently the declaratory

relief sought is in itself a sufficient basis to deny such discretionary relief as a

declaratory judgment.

Furthermore, the district court committed no clear error of judgment in

determining that the relief requested "would do little to provide concrete relief and

clarification to the parties in this case."  "[A] declaratory judgment may only be

issued in the case of an 'actual controversy.'"  <u>Malowney v. Fed. Collection</u>

<u>Deposit Grp</u>., 193 F.3d 1342, 1347 (11th Cir. 1999).  "The controversy must be

definite and concrete, touching the legal relations of parties having adverse legal

interests."  <u>Aetna Life Ins. Co. v. Haworth</u>, 300 U.S. 227, 240-41 (1937).  "It must

be a real and substantial controversy admitting of specific relief through a decree

---

[19] The import of the requests in the complaint and in the response to the show-cause order is not the same.  The timing of findings called for in the response would be a significant additional restriction on Immigration Judges on top of the restricting requirement that Immigration Judges must make express findings.  The timing requirement and the express-findings requirement both go beyond the duty simply to make a record that would justify closure of the courtroom.

32

of a conclusive character, as distinguished from an opinion advising what the law

would be upon a hypothetical set of facts." Id. at 241.

We stress -- and no one disputes -- that immigration hearings already are

presumptively open to the public. See 8 C.F.R. § 1003.27.[20]  That the

circumstances in which an Immigration Judge may close a hearing are already

limited by regulation undercuts significantly the necessity and usefulness of

Plaintiff's requested declaration.

Moreover, this case is not one in which immigration hearings were closed

and in which the record is obviously without facts to justify the closures.  Instead,

sufficient facts exist in the record to show the basis upon which the hearings were

---

[20] Section 1003.27 provides expressly that "[a]ll hearings, other than exclusion hearings, shall be open to the public except" in these circumstances:

> (a)  Depending upon physical facilities, the Immigration Judge may place reasonable limitations upon the number in attendance at any one time with priority being given to the press over the general public;

> (b)  For the purpose of protecting witnesses, parties, or the public interest, the Immigration Judge may limit attendance or hold a closed hearing.

> (c)  In any proceeding before an Immigration Judge concerning an abused alien spouse, the hearing and the Record of Proceeding shall be closed to the public unless the abused spouse agrees that the hearing and the Record of Proceeding shall be open to the public.  In any proceeding before an Immigration Judge concerning an abused alien child, the hearing and the Record of Proceeding shall be closed to the public.

> (d)  Proceedings before an Immigration Judge shall be closed to the public if information subject to a protective order under § 1003.46, which has been filed under seal pursuant to § 1003.31(d), may be considered.

8 C.F.R. § 1003.27.

33

closed and from which a reviewing body could determine whether closure, pursuant to 8 C.F.R. § 1003.27, was warranted.

The district court also was aware that, by means of declaratory relief, the court was being asked to instruct immigration tribunals in how to discharge their duties: a sensitive point for separation of powers among other things. Given the circumstances, the district court could conclude properly that the nature of the dispute, danger, and uncertainty to which the court's attention was being called was insufficient to demand the declaration requested. In short, Plaintiff has failed to satisfy the difficult burden of showing that the district court abused its "unique and substantial discretion" in deciding whether to exercise jurisdiction over Plaintiff's claim for declaratory judgment. In the light of the substantial deference afforded district courts about what is useful and necessary in the declaratory judgment context, we accept the district court's conclusion.

AFFIRMED.

WILLIAMS, District Judge, concurring:

Although I concur in today's result, I write separately to address the scope of the absolute judicial immunity standard articulated by the majority.  Specifically, I believe their analysis expands the protections of judicial immunity further than is necessary to decide this case and beyond the boundaries set by the Supreme Court.

First, I disagree with the blanket assertion that for judicial immunity purposes, ordering persons removed from the courthouse is an obligation for judges and an ordinary function performed by judges.[1]  To be sure, ordering a person removed from a courthouse can be an "ordinary" judicial function where the person disrupts, threatens, or otherwise impedes a judicial proceeding before the judge.  Absent this connection to an ongoing judicial proceeding, however, the "nature of the function" performed is not necessarily judicial.  *See Forrester v. White*, 484 U.S. 219, 226-29 (1988) (distinguishing between truly judicial acts and "functions that judges may on occasion be assigned by law to perform," and holding that although judges may be obligated to—and may "ordinarily"—hire and fire individuals in their staff, they are not entitled to absolute immunity for these administrative, rather than judicial decisions).

---

[1] The cases cited by the majority to support this proposition all involve individuals who disturbed ongoing proceedings in the courtroom or otherwise obstructed adjudicatory matters before the judge.  None address judicial immunity.

35

In this case, according to Professor Stevens' own allegations, she was removed from the building after she did not immediately comply with IJ Cassidy's order to exit his courtroom so a sealed matter could proceed. As such, I agree that, on this record, IJ Cassidy's removal of Professor Stevens was a normal judicial function, because he issued the order during and as part of an ongoing proceeding.

Second, although I agree that the removal order "arose directly and immediately out of IJ Cassidy's dealing with Plaintiff in his judicial capacity," I disagree that in reaching this conclusion, we should rely on a metric of the temporal proximity—approximately fifteen minutes—between IJ Cassidy's order that Professor Stevens exit the courtroom and her removal from the building. In my view, IJ Cassidy engaged with Professor Stevens in a judicial capacity not based on any temporal test (15 minutes, an hour, a day, a week, etc.), but because he was on the bench presiding over an immigration matter when he ordered Professor Stevens to exit his courtroom. She apparently failed to comply, and IJ Cassidy ordered her removal from the building to carry out his initial order. Professor Stevens' removal thus "arose directly and immediately" out of an order issued during an ongoing proceeding. If that were not the case, however, and the removal order were merely "temporally related" to Professor Stevens' presence in IJ Cassidy's courtroom, then IJ Cassidy could not "meaningfully be distinguished" from any employee, clerk, law enforcement officer, security guard, or building

36

manager who could similarly initiate her removal from the building, and judicial immunity would not apply. *Forrester*, 484 U.S. at 229.[2]

Finally, although I agree that on this record IJ Cassidy is entitled to judicial immunity, I am concerned about the question of Professor Stevens' remedy for his conduct. The decision in *Bradley v. Fisher*, 13 Wall. 335, 20 L.Ed. 646 (1872), which established the doctrine of absolute judicial immunity, explained that the doctrine was designed to further the public interest in an independent judiciary, sometimes at the expense of legitimate individual grievances. *Id.* at 349; *Pierson v. Ray*, 386 U.S. 547, 554 (1967). The *Bradley* Court accepted those costs to aggrieved individuals only because the judicial system itself provided other means of protecting individual rights: "Against the consequences of [judges'] erroneous or irregular action, from whatever motives proceeding, the law has provided for private parties numerous remedies, and to those remedies they must, in such cases, resort." *Fisher*, 13 Wall., at 354. However, the facts of this case amply demonstrate that the Atlanta Immigration Court's administrative procedures did

---

[2] In *Forrester v. White*, 484 U.S. 219, 229 (1988), the Supreme Court held that judges' decisions to hire and fire staff are not "judicial" because "a judge who hires or fires a probation officer cannot meaningfully be distinguished from a district attorney who hires and fires assistant district attorneys, or indeed from any other Executive Branch official who is responsible for making such employment decisions." (citing *Ex parte Virginia*, 100 U.S. (10 Otto) 339, 25 L.Ed. 676 (1880)); *see also Gregory v. Thompson*, 500 F.2d 59, 64–65 (9th Cir. 1974) (holding that a judge who himself forcibly expelled a litigant from his courtroom was not entitled to absolute immunity because his "choice to perform an act similar to that normally performed by a sheriff or bailiff should not result in his receiving absolute immunity . . . simply because he was a judge at the time.").

not provide an avenue for meaningful review to safeguard Professor Stevens' rights, especially in light of her history with IJ Cassidy and the Executive Office for Immigration Review.[3]

The doctrine of judicial immunity is an important one, and opinions narrowing that doctrine must be thoughtfully circumscribed. By the same token, however, opinions expanding the doctrine demand commensurate caution. I agree that, on this record, IJ Cassidy may invoke judicial immunity for his order removing Professor Stevens from the building. But that conclusion is based on a far narrower understanding of what acts qualify as "truly judicial acts" and are therefore entitled to absolute judicial immunity. Because I believe that the

---

[3] The majority does not address the personal, non-judicial reasons that allegedly motivated IJ Cassidy to remove Professor Stevens from the building and that involved nearly the entire apparatus of the EOIR. *See Harris v. Deveaux*, 780 F.2d 911, 915 (11th Cir. 1986) (recognizing that judges' acts may not be entitled to judicial immunity if they result from "events in their private, nonjudicial lives, events in which they ha[ve] a personal stake."). Though they acknowledge that "Plaintiff had published criticisms of deportation proceedings in general and of Immigration Judge William Cassidy's performance in particular," they fail to mention that based on these criticisms—including a piece that denounced IJ Cassidy for mistakenly deporting an American citizen—IJ Cassidy and EOIR officials monitored and tracked Professor Stevens' visits to courtroom proceedings all over the Southeast. For example, in June 2009, the Atlanta Court Administrator emailed nineteen EOIR officials notifying them of Professor Stevens' upcoming visit to Atlanta to obtain public records. In January 2010, IJ Cassidy (in Atlanta, GA) emailed an Assistant Chief Immigration Judge (in Falls Church, VA) to notify him that Professor Stevens was visiting the Stewart facility in Georgia. In April 2010, Professor Stevens visited an immigration facility in Lumpkin, Georgia. Upon her arrival, the Court Administrator immediately emailed EOIR public relations staff that Professor Stevens "want[s] access to view the court hearing today . . . Please advise!" According to the record, no other individual had ever attracted this kind of attention from EOIR officials. Moreover, about a week after the expulsion giving rise to this lawsuit, an employee in the Department of Justice's Public Affairs Office emailed his colleagues regarding the "[p]ossible banning of blogger from immigration court." These facts animate the claim that the process available to Professor Stevens was not just "displeasing" but was arguably inadequate as a check on IJ Cassidy's misconduct.

majority's analysis of IJ Cassidy's entitlement to judicial immunity has the potential to undermine the constitutional right of open access to public proceedings, I respectfully concur in the outcome only.